**Son H. FLEMING, Petitioner-Appellant,**

**v.**

**Ralph KEMP, Respondent-Appellee.**

**No. 83–8321.**

United States Court of Appeals,
Eleventh Circuit.

Nov. 29, 1984.

# 1436

Kenneth Shapiro, Atlanta, Ga., for petitioner-appellant.

Mary Beth Westmoreland, Asst. Atty. Gen., Atlanta, Ga., for respondent-appellee.

Before TJOFLAT and VANCE, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

The petitioner, Son H. Fleming, is a Georgia inmate who has been convicted of the murder of James Edward Giddens, the police chief of Ray City, a small town in south Georgia, and sentenced to death.[1] He applied to the district court for a writ of habeas corpus, contending that his conviction and/or sentence were invalid on thirty-nine federal constitutional grounds. All the claims had previously been considered on their merits and rejected by the Georgia courts.[2] The district court refused to issue the writ. Petitioner appeals, raising eight of the claims he brought to the district court. We affirm.

---

1. Petitioner was convicted in the Superior Court of Lanier County, Georgia of malice murder on January 26, 1977 and, on the jury's recommendation, was sentenced to death. On direct appeal, the Georgia Supreme Court affirmed the conviction but reversed the death sentence because the trial judge erred in instructing the jury during the sentencing phase. *Fleming v. State,* 240 Ga. 142, 240 S.E.2d 37 (1977). Following remand, petitioner moved for a change of venue, and the superior court judge transferred the case to Cook County, Georgia for the sentencing trial. The jury again recommended the death penalty, and the court sentenced petitioner accordingly. The Georgia Supreme Court affirmed the death sentence, and the U.S. Supreme Court denied petitioner's application for certiorari. *Fleming v. State,* 243 Ga. 120, 252 S.E.2d 609 (1979), *cert. denied,* 444 U.S. 885, 100 S.Ct. 177, 62 L.Ed.2d 115 (1979). Thereafter, petitioner sought habeas corpus relief in the Superior Court of Tattnall County, Georgia claiming 52 separate errors. On July 1, 1980

that court found petitioner's allegations to be without merit and denied relief. The Georgia Supreme Court denied petitioner's application for a certificate of probable cause to appeal that decision on October 21, 1980, and on November 14, 1980, his motion for reconsideration. Petitioner filed a second petition for a writ of certiorari in the U.S. Supreme Court, which was also denied. *Fleming v. Austin,* 452 U.S. 910, 101 S.Ct. 3040, 69 L.Ed.2d 412 (1981).

2. 28 U.S.C. §§ 2254(b) and (c) (1982) state that

(b) An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

## I.

The evidence presented to the petit jury during the state criminal prosecution in this case was introduced at two trials.[3] At the first trial, which began on January 24, 1977, the jury found petitioner guilty of malice murder and recommended that he be sentenced to death. The trial judge, required by Georgia law to follow the jury's recommendation, imposed the death penalty. The Supreme Court of Georgia set aside petitioner's death sentence,[4] and he thereafter received a new sentencing trial. At this trial, convened on December 5, 1977, the parties, collectively, introduced essentially the same evidence adduced at the first trial, and, on the jury's recommendation, the court again sentenced petitioner to death. For ease of presentation, we recite the evidence as if the guilt and penalty phases of petitioner's trial had been held before the same jury.[5]

### A.

The murder of James Edward Giddens took place between 10:30 and 11:00 p.m. on February 11, 1976 near Lakeland, Lanier County, Georgia. It was the last of a series of crimes committed that night by petitioner, Son H. Fleming, and his accomplices, Henry Willis III and Larry Donnell Fleming (petitioner's nephew), in south central Georgia. On the afternoon of February 11, petitioner, in Moultrie, Georgia, borrowed a red and white Ford car from Terry Coney, a friend. At about 8:00 p.m., petitioner left Moultrie in the car with Larry Donnell Fleming and Henry Willis III as passengers.

The three men robbed a convenience store that evening between 10:00 and 10:30 in Adel, Georgia.[6] Larry Fleming and Willis, one of them armed with a .22 caliber revolver, went into the store while petitioner remained in the car. They accosted the manager, rifled the cash register, and fled with a brown paper bag of money and a carton of Kool cigarettes.

James Edward Giddens, the police chief of Ray City,[7] was sitting in his police car in Ray City talking with a friend, L.V. Dupree, when he received a broadcast over his police radio about the robbery. Shortly thereafter, the red and white Ford passed through Ray City. The car appeared to have two occupants, but, in fact, there was a third who was hidden from view. One of the occupants wore a baseball cap. Chief Giddens pursued the car to investigate. Moments later, he radioed the police dispatcher that he was stopping the car and gave a conclusive description of it, including the license number. Once both cars were stopped, petitioner, the driver of the Ford, got out to speak with Chief Giddens. One of the other men with petitioner jumped Giddens and all three men struggled for his service revolver. After significant difficulty, they subdued Giddens and, at gunpoint, placed him in the Ford. Petitioner then proceeded to drive the car over some isolated country roads.

During the trip, Chief Giddens begged them to spare his life, telling them that he would never report the incident, that he had a wife and three small children, and that he was scheduled to retire from the police force the next day. Petitioner stopped the car near a swamp and every-

---

(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

*Rose v. Lundy*, 455 U.S. 509, 518, 102 S.Ct. 1198, 1203, 71 L.Ed.2d 379 (1982), and *Galtieri v. Wainwright*, 582 F.2d 348, 355 (5th Cir.1978) (en banc), hold that a federal district court should not entertain a habeas petition containing unexhausted claims.

3. *See supra* note 1.

4. *Fleming v. State*, 240 Ga. 142, 240 S.E.2d 37 (1977). *See supra* note 1.

5. In relating the facts surrounding the commission of the murder, we draw the inferences the jury no doubt drew in finding petitioner guilty of malice murder.

6. Adel, Georgia is located approximately 25 miles from Moultrie in adjoining Cook County.

7. Ray City, Georgia is situated approximately 14 miles east of Adel in adjoining Berrien County.

one got out. Chief Giddens ran into the swamp, whereupon petitioner shot at him three times with Giddens' .38 caliber revolver. One of the bullets went through the chief's body, crippling him. Giddens struggled to escape. Petitioner gave Giddens' revolver to one of the others. The two younger men, now armed with Giddens' revolver and the .22 caliber pistol used in the robbery, hunted down the chief and pumped his body full of bullets from close range.

Twenty minutes after Chief Giddens radioed that he was stopping the red and white Ford, L.V. Dupree found his patrol car along the highway, where petitioner and his accomplices had left it, and used the car's police radio to report the incident to the police radio dispatcher. The police immediately broadcast an alert for the Ford, and two hours later, at 12:30 in the morning of February 12, two Brooks County deputy sheriffs stopped the Ford near Barney, Georgia.[8] The Ford appeared to have two occupants: petitioner, wearing a baseball cap, behind the steering wheel, and a black male passenger in the right front seat. The deputies drew their weapons and ordered the two men to get out of the car. Petitioner and Willis, the passenger, complied and were placed under arrest. One of the deputies then searched the Ford and discovered Larry Fleming hiding by the front seat, under the dashboard. The deputy also discovered Chief Giddens' revolver, a .22 caliber pistol loaded with ratshot,[9] a brown paper bag of money and a carton of Kool cigarettes.

The next day, the police found Chief Giddens' bullet-riddled body face down in the swamp about 100 feet from county road 122, between Lakeland and Hihira. An autopsy revealed that he had been shot several times in the face with ratshot at a range of less than fifteen inches. He had also been shot five times with his own revolver. Chief Giddens had somehow survived all of these gunshot wounds; he died from drowning.

### B.

Petitioner, Willis, and Larry Fleming were arrested, advised of their rights and transported to the Brooks County jail.[10] At 10:00 a.m. petitioner gave an oral statement[11] to the police. In this statement, he said that he knew nothing about Giddens' murder and that he was in Valdosta with his uncle, Cain West, when it occurred. Later in the day, the three arrestees were taken before a justice of the peace who advised them of the charges lodged against them—armed robbery, kidnapping with bodily injury, and murder—and of their rights.

On February 16, law enforcement officers confronted petitioner with Cain West's statement that petitioner had not been with him in Valdosta at the time of the murder, as petitioner had contended. At this point petitioner made a second oral statement to the police in which he repudiated his alibi and admitted that he had been with Willis and Larry Fleming on the night of February 11.[12] He professed innocence, however, claiming that Willis and Larry Flem-

---

**8.** Barney, Georgia is located approximately 22 miles west of Ray City.

**9.** "Ratshot" is a type of cartridge loaded with numerous small shot, similar to a shotgun shell, that can be fired from a rifle or pistol.

**10.** Meanwhile, the manager of the robbed convenience store identified Larry Fleming and Willis as the robbers.

**11.** Petitioner informed police that he could neither read nor write; accordingly, the police did not take a signed statement.

**12.** Petitioner gave the police four statements in all, after receiving and waiving his *Miranda* rights. The first statement was given to Detec-

tive Register and Sheriff Gaskins on February 12, as we indicate in the text *supra*. This was an unrecorded, oral alibi statement. It was introduced into evidence at both the guilt and penalty phases of petitioner's trial, through the testimony of the two officers who related it from their recollection.

The second alibi statement was given to Georgia Bureau of Investigation Agent Greeson on February 15 and was tape recorded. This statement was not introduced into evidence in the guilt phase of petitioner's trial. The State did introduce it in the penalty phase, however, through Greeson's testimony. Greeson described the circumstances under which the statement had been given and summarized its contents; neither side sought to place the tape recording

ing were completely responsible for the kidnapping and murder of Chief Giddens. Petitioner said the other two forced him, against his will, to participate in the crimes. Willis and Larry Fleming overpowered Chief Giddens. They compelled him to drive the car, and they eventually committed the murder. Petitioner only acted out of fear for his own safety. He even begged Willis and Larry Fleming to spare Giddens' life because of the chief's story about his wife and three small children.

On the afternoon of February 16, petitioner, along with Willis and Larry Fleming, appeared before Judge Lott of the Berrien County Superior Court.[13] Judge Lott advised petitioner of the three crimes for which he was being held and of his right to an attorney. Petitioner replied that his mother was going to hire a lawyer for him.

On February 17, the Berrien County grand jury, having territorial jurisdiction over the kidnapping offense, indicted the three men for kidnapping with bodily injury, a capital felony. The grand juries of Cook and Lanier Counties, where the robbery and murder, respectively, had occurred, were not in session, and new grand juries would not be impaneled until the summer or early fall. Consequently, indictments for the armed robbery and murder charges would be delayed.

On February 24, the three men again appeared before the Berrien County Superior Court. Petitioner's mother had not been able to hire a lawyer to defend petitioner so the judge appointed Edward Parrish, an experienced trial attorney, to represent him on the kidnapping with bodily injury charge. (Petitioner had not been appointed counsel on the armed robbery and murder charges because he had not been indicted for those offenses.) The court also appointed counsel for Willis and Larry Fleming. Larry Fleming's counsel then associated Millard Farmer, an Atlanta criminal defense lawyer with considerable experience and expertise in capital cases, as co-counsel. Shortly thereafter, Farmer requested the prosecutor in the Superior Court for Berrien, Cook, and Lanier Counties to arrange an "evidentiary hearing" before a justice of the peace on all three charges so that the defense could examine the State's evidence. Neither Farmer nor any other defense counsel requested a "committal hearing"[14] for the purpose of

of the statement or a transcript thereof before the jury.

The third statement was given to Detective Register and Sheriff Gaskins on February 16. The officers tape recorded their interrogation of petitioner and then prepared a digest of that transcript in narrative form. Petitioner signed the digest, after advising the officers that he could read and write and signing a statement to that effect. Some time later, the officers made a written transcript of the tape recording, and it, together with transcripts of petitioner's other tape recorded statements, was produced to the defense and made available to the court at the *Jackson-Denno* hearing. *See infra* p. 1449. This statement was received in evidence at the penalty trial; Register and Gaskins both testified as to the circumstances surrounding the making of the statement and its contents, and the signed digest thereof was read to the jury. In this statement, petitioner said that he was not with Willis and Larry Fleming when they robbed the convenience store; that he joined them later; that they kidnapped Chief Giddens and forced petitioner, against his will, to drive them to the murder scene; and that Willis and Larry Fleming shot and killed Giddens over petitioner's protest.

The fourth statement, referred to in the text accompanying this note, was the second one petitioner made on February 16. The statement was given to Sheriff Alderman, a friend of petitioner's, after petitioner asked to see him. Alderman testified as to its contents at both phases of the trial.

13. The Alpha Judicial Circuit of the Georgia Superior Court encompassed Berrien, Cook and Lanier Counties; accordingly, it had jurisdiction over all three charges against petitioner. Judge Lott presided over all proceedings relating to the prosecution of petitioner's criminal case, except the "committal hearing" held on May 14, 1976. *See infra* note 14 and accompanying text.

14. Ga.Code Ann. § 17–7–23(a) (1982) provided that, prior to indictment, an accused being held in custody could demand a preliminary hearing, called a commitment hearing and, as here, often referred to as a "committal hearing," for the purpose of determining whether there existed probable cause to believe that the accused committed the crime charged and, if so, whether to bind him over to the grand jury. A grand jury indictment eliminated the accused's right to such a hearing and deprived the committal court of jurisdiction to hold one. *First Nat'l Bank & Trust Co. v. State*, 137 Ga.App. 760, 224

determining whether probable cause existed to believe that the accused committed the crimes in question and, if so, whether he should be bound over to the grand jury. (The Berrien County grand jury indictment had already resolved the first issue as to the capital offense of kidnapping with bodily injury, and the three accused were being held on that charge.[15])

A justice of the peace for Cook County eventually convened the requested evidentiary hearing in Adel on May 14, 1976.[16] Farmer appeared as counsel for all three defendants. Petitioner's appointed counsel on the kidnapping charge, Edward Parrish, chose not to participate in the hearing. The hearing lasted one and one-half days. It was, as Farmer had requested, a discovery hearing, the court not undertaking to determine whether probable cause existed to hold the accused answerable for armed robbery or murder.

On July 15, 1976 the Lanier County grand jury indicted petitioner and his two accomplices for malice murder. Shortly thereafter, the Cook County grand jury indicted them for armed robbery. On August 12, the Superior Court, sitting in Lanier County, appointed a former assistant U.S. Attorney to represent petitioner on the murder charge. He withdrew from the case two weeks later for reasons not pertinent to these proceedings, and Edward Parrish, who had been appointed to represent petitioner on the kidnapping charge and who had been investigating the whole incident for six months, was immediately appointed to represent petitioner on the murder charge. Benjamin Zeesman, an experienced trial lawyer retained by petitioner's mother, also entered an appearance for petitioner.

---

S.E.2d 866, *aff'd*, 237 Ga. 112, 227 S.E.2d 20 (1976). In petitioner's case, the return of the kidnapping with bodily injury indictment by the Berrien County grand jury on February 17, 1976 deprived petitioner of the right to a committal hearing on that charge.

15. The Superior Court of Berrien County had ordered petitioner held without bail. Georgia law authorized the court to do so, Ga.Code Ann. § 17–6–1 (1982) providing, in pertinent part, that "[t]he offenses of ... armed robbery, ...

## C.

On December 13, 1976 petitioner was arraigned on the murder charge in Lanier County. (Petitioner was arraigned in Cook and Berrien Counties, respectively, but never tried, on the armed robbery and kidnapping with bodily injury charges.) On January 24, 1977 he went to trial before a jury.

In his opening statement to the jury, the prosecutor said that the State would prove that petitioner was the principal culprit and that he fired the first shots at Chief Giddens. The prosecutor then presented the facts we have related and established through balistics experts that the .38 caliber slugs taken from Giddens' body came from his service revolver and the ratshot came from a .22 caliber pistol of the type the police found in petitioner's car. One of petitioner's cellmates in the Cook County jail, where petitioner was being held, testified that petitioner told him that he voluntarily took part in the robbery, the kidnapping, and the murder. According to the cellmate, petitioner said he fired the first shots at Chief Giddens with the chief's own revolver.

The prosecutor also introduced petitioner's previous statements to the police—the first, that he was not present when the crimes were committed; the second, that he was forced to participate in them— which were strikingly inconsistent with what he told his cellmate.[17] Finally, anticipating an alibi defense, the prosecutor established that the three people whom petitioner originally claimed to have been with during the time of the killing had not been with petitioner at that time.

The theory of petitioner's defense was alibi. Petitioner chose to present the defense himself; he called no other witness-

---

[and] murder ... are bailable only before a judge of the superior court; and the granting of bail is, in every case, a matter of sound discretion."

16. The transcript of this hearing indicated that it was "[i]n the Superior Court of Berrien, Cook, and Lanier Counties" and covered all three charges against the three accused.

17. These two statements are described *supra* in note 12 and the accompanying text.

es. Petitioner testified that on the evening of February 11 he drove to Valdosta to visit his uncle, Cain West. He gave Willis and Larry Fleming a ride. There he got out and went to look for his uncle and several other friends. The other two drove off in the car. Several hours later, they returned to pick him up and would not tell him where they had been. On the way home they were stopped by the police and arrested.

In their closing arguments to the jury, petitioner's lawyers acknowledged that the jury might not believe petitioner's testimony and suggested that, if the jury rejected his alibi, they should accept his post-arrest statement to the police that he was forced to take part in the kidnapping and murder against his will. Counsel placed all the blame on Willis and Larry Fleming, characterizing them as "fireballs," "kids" who took advantage of a gentle, older man. The jury accepted none of these defense arguments and convicted petitioner of malice murder.

In the penalty phase of the trial,[18] the State relied on the evidence it had produced earlier. Petitioner then took the witness stand to testify in mitigation. He adhered to the alibi that he had presented at the guilt phase of the trial and attempted to explain away the inconsistent incriminating statements he had given to the police following his arrest.[19] He claimed that these statements had been coerced, the police having beaten him to the point that he was afraid not to cooperate.

In their final summation to the jury, petitioner's lawyers repeated the closing arguments they had given at the guilt phase of the trial. They stressed the testimony of Sheriff Alderman, who had taken petitioner's February 16 statement and was a personal friend of petitioner's, that petitioner cried when he confessed to being forced to take part in the crime and appeared genuinely to regret Sheriff Giddens' death. They also relied on some points they had. developed in cross-examining several other law enforcement officers; petitioner had a long employment history, respected law enforcement officers in general, and had never been convicted of a violent crime. The jury nonetheless recommended the death penalty, finding two aggravating circumstances: (1) the victim was a police officer engaged in the performance of his duties,[20] and (2) defendant committed the murder while engaged in the commission of another capital felony, kidnapping with bodily injury.[21]

After exhausting his state remedies, petitioner instituted these habeas corpus proceedings in the district court, presenting thirty-nine federal constitutional claims. Two required an evidentiary hearing: petitioner's claim that he was denied counsel at a critical stage in his state criminal proceeding, i.e., the evidentiary hearing before the Cook County justice of the peace, and his claim that his lawyers' performance during both phases of his trial was incompetent. After hearing the parties' evidence on these issues, the district court denied relief on all of petitioner's claims.

In this appeal, petitioner brings eight of the claims presented below. Only four are worthy of discussion.[22] First, petitioner

18. These proceedings took place on December 5, 1977 in Cook County. The court moved the case to Cook County in response to petitioner's motion for a change of venue. *See supra* note 1.

19. *See supra* note 12.

20. Ga.Code Ann. § 17–10–30(b)(8) (1982).

21. Ga.Code Ann. § 17–10–30(b)(2) (1982).

22. We deny without extended discussion the following four claims raised by petitioner. First, the prosecution deliberately withheld exculpatory evidence from defense attorneys, including the fact that the prosecution promised parole to petitioner's cellmate in return for testifying that petitioner confessed to the crime, in violation of *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 96–97, 10 L.Ed.2d 215 (1963). Second, in recommending the death sentence, the jury improperly relied on the nonstatutory aggravating circumstance that the murder left a young widow with three small children. Third, the court improperly instructed the jury as to its application of mitigating circumstances. Fourth, venire persons were disqualified improperly on the ground that their conscientious scruples against capital punishment would automatically render them unable to impose the death penalty, in violation of the rule of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d

was denied the presence of counsel at a critical stage of his criminal proceeding, in violation of the sixth and fourteenth amendments,[23] thus automatically vitiating his conviction and barring his retrial. Second and third, petitioner was denied effective assistance of counsel at both the guilt and penalty phases of his trial, in violation of the fifth, sixth and fourteenth amendments.[24] Fourth, since the jury at neither phase of his trial explicitly found that petitioner either intended or participated in Chief Giddens' killing, the eighth and fourteenth amendments[25] prohibited the imposition of the death sentence. We consider petitioner's claims sequentially.

## II.

### A.

■ Petitioner claims that he was denied the representation of counsel at a "critical stage" of his state criminal proceeding, the May 14, 1976 evidentiary hearing before the Cook County justice of the peace, in violation of the sixth and fourteenth amendments, *see Coleman v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970), and that his conviction must therefore be set aside. He claims, moreover, that *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), bars the State[26] from trying him again for the murder of Chief Giddens.

776 (1968). We note in passing that, under the Georgia contemporaneous objection rule, a defendant must object to the prosecution's voir. dire at trial in order to preserve the issue for appeal. *State v. Graham,* 246 Ga. 341, 271 S.E.2d 627, 628 (1980); *White v. State,* 146 Ga. App. 810, 247 S.E.2d 536 (1978). Here, the defense failed to raise the *Witherspoon* objections at trial. This constituted a "procedural default" under *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Darden v. Wainwright,* 725 F.2d 1526, 1549 (11th Cir.1984) (en banc) (Tjoflat, J., dissenting). Accordingly, petitioner would normally be required to show cause for failing to object and actual prejudice resulting from the forfeiture. *United States v. Frady,* 456 U.S. 152, 167–68, 102 S.Ct. 1584, 1594, 71 L.Ed.2d 816 (1982); *Engle v. Isaac,* 456 U.S. 107, 126–35, 102 S.Ct. 1558, 1571–75, 71 L.Ed.2d 783 (1982). However, as we stated in *Rogers v. McMullen,* 673 F.2d 1185, 1188 (11th Cir.1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 740, 74 L.Ed.2d 961 (1983), where a state appellate court does not rely on a procedural default in rejecting the claimed error and reaches the merits instead, the federal habeas courts may review the petitioner's claim of error. *See also Thompson v. Estelle,* 642 F.2d 996 (5th Cir. 1981). Here, the Superior Court of Tattnall County, Georgia, in considering petitioner's *Witherspoon* claim, denied it on the merits, and the Georgia Supreme Court affirmed that decision by operation of law by declining to review it. *See supra* note 1.

As for the first claim, the state trial judge found that no secret deal for parole existed and that the prosecutor withheld no *Brady* material; this finding was not clearly erroneous. The second claim is without merit because the jury's finding of two valid statutory aggravating circumstances authorized imposition of capital punishment. *Zant v. Stephens,* 462 U.S. 862, ——— ——, 103 S.Ct. 2733, 2744–45, 77 L.Ed.2d 235 (1983). As for the third claim, the court adequately instructed the jury on mitigating cir-

cumstances and their relationship to aggravating circumstances. As to the fourth claim, the venire voir dire was sufficient for the court to determine whether a prospective juror was qualified under the *Witherspoon* test to participate in the sentencing phase of the trial. The court' excused no venire person who appeared to be qualified to sit.

23. The sixth amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." The fourteenth amendment makes the sixth amendment right to counsel applicable to state court proceedings. *Gideon v. Wainwright,* 372 U.S. 335, 342, 83 S.Ct. 792, 795, 9 L.Ed.2d 799 (1963).

24. Petitioner provides no authority for the proposition that the denial of counsel violated the fifth amendment. We therefore consider this claim as a violation of the sixth and fourteenth amendments.

25. The eighth amendment provides that "cruel and unusual punishments [will not be] inflicted." This amendment is made applicable to state criminal proceedings through the fourteenth amendment due process clause. *Furman v. Georgia,* 408 U.S. 238, 239–40, 92 S.Ct. 2726, 2727, 33 L.Ed.2d 346 (1972).

26. Under the sixth amendment, an indigent defendant, such as petitioner, is entitled to counsel at any "critical stage" in his criminal prosecution, i.e., one in which the "substantial rights" of the defendant may be affected. *See, e.g., Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *United States v. Wade,* 388 U.S. 218, 227, 87 S.Ct. 1926, 1932, 18 L.Ed.2d 1149 (1977); *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). *Coleman v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970), holds that a preliminary hearing such as

■ The May 14, 1976 evidentiary hearing was held at the request of Millard Farmer, the Atlanta criminal lawyer Larry Fleming's attorney had brought into the case, to enable the defense to discover the State's evidence on all three pending charges. Petitioner contends that this evidentiary hearing was actually a committal hearing convened by the court to determine probable cause as to the then unindicted crimes, armed robbery and malice murder, and whether the accused should be bound over to the grand jury. (The accused had already been indicted in Berrien County for kidnapping with bodily injury, and since it was a capital offense they were being held without bail on that charge.) The State, in response, contends that the hearing was not a committal hearing; rather, it was simply an informal discovery session, albeit presided over by a judicial officer, requested by defense counsel, and agreed to by the prosecutor. This is apparent from the fact that the presiding judicial officer made no probable cause determinations at the conclusion of the proceeding.[27]

Petitioner first raised his claim of denied representation in the habeas corpus petition he addressed to the Tattnall County Superior Court.[28] That court, following an evidentiary hearing, sidestepped the questions concerning the nature of the May 14, 1976 proceeding and petitioner's representation and focused instead on the question of whether petitioner had been prejudiced by the proceeding. The court found that petitioner had suffered no prejudice and accordingly rejected his claim.

The district court, being bound by no fact findings regarding the nature of the hearing and petitioner's representation thereat, see 28 U.S.C. § 2254(d) (1982), referred petitioner's claim to the magistrate for an evidentiary hearing. After hearing the testimony of several witnesses, the magistrate found that the May 14, 1976 proceeding was, in fact, a committal hearing and that petitioner had not been represented because Edward Parrish, his court-appointed attorney on the kidnapping charge, chose not to attend. The magistrate concluded that *Holloway v. Arkansas* and *Coleman v. Alabama* mandated that petitioner's conviction and death sentence be set aside, and he recommended that the district court issue the writ.[29]

The district court, after the State objected to the magistrate's recommendation, convened an evidentiary hearing, heard additional testimony, and considered petitioner's claim *de novo*. The court found, alternatively, that the May 14, 1976 proceeding was an "agreed-upon discovery conference," not a committal hearing, and that attorney Farmer had represented petitioner

the commitment hearing provided by Georgia law, see supra note 14, is a "critical stage." Petitioner contends that *Holloway* held that the denial of counsel at any "critical stage" vitiates any conviction that follows and also bars any retrial of the defendant. In making this contention, he overlooks the language of *Coleman* indicating that the denial of counsel at a preliminary hearing does not vitiate the defendant's subsequent conviction if the denial was "harmless error under *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)." 399 U.S. at 11, 90 S.Ct. at 2004. The logical extension of this holding would suggest that a defendant's retrial would not be barred if the denial of counsel at the preliminary hearing would not taint the retrial proceedings. We need not decide the question, however, because we conclude, as did the district court below, that petitioner was represented by counsel at the May 14, 1976 hearing.

27. The record strongly supports the State's position that the May 14, 1976 hearing was not a committal hearing. First, the Cook County Justice of the Peace had subject matter jurisdiction only over the crime committed in Cook County, armed robbery; he did not have jurisdiction over the malice murder offense now under review, because that offense took place in Lanier County, Ga.Code Ann. § 15–10–50(b) (1982), or the kidnapping with bodily injury offense, because that offense occurred in Berrien County, id., and the grand jury had already returned an indictment thereon. See supra note 14. Second, the justice of the peace neither entertained argument nor entered an order on the issues posed by a committal hearing. Third, defense counsel viewed the hearing as merely a discovery session; as attorney Farmer told the district court at the habeas hearing, he requested the hearing to discover the State's case.

28. See supra note 1.

29. The magistrate did not decide the point petitioner now presents to us, that *Holloway v. Arkansas* would bar his retrial.

at that hearing. The court therefore denied petitioner's claim.

Whether the May 14, 1976 proceeding constituted a committal hearing and, thus, a critical stage in petitioner's prosecution for sixth amendment right to counsel purposes is a nettlesome question. Had petitioner and his two companions already been indicted for all of the crimes for which they had been arrested, so as to render a preliminary hearing to determine probable cause unnecessary, we might have little difficulty in concluding that the proceeding was, as the State has portrayed it, merely a makeshift discovery session not provided for by the Georgia law, which the parties arranged for their own convenience. But this is not the case; the grand juries for Cook and Lanier Counties had not yet met and probable cause to believe that the three accused had committed armed robbery and malice murder had not been authoritatively determined. Thus, how to label this proceeding is, indeed, debatable.

We need not decide the question, however, for we agree with the district court's alternative holding that petitioner received the representation of counsel, by Mr. Farmer, at that hearing.[30] That holding, in the context of this case, constituted a finding of fact which we must accept unless clearly erroneous. *See* Fed.R.Civ.P. 52(a). *See also Baty v. Balkcom*, 661 F.2d 391 (5th Cir. Unit B 1981), *cert. denied*, 456 U.S. 1011, 102 S.Ct. 2307, 73 L.Ed.2d 1308 (1982);[31] *Patterson v. United States*, 487 F.2d 341 (5th Cir.1973)[32] (holding that Rule 52(b) applies to factual determinations in 28 U.S.C. § 2254 (1982) proceedings in the district court).

The district court's finding that Farmer represented petitioner at the May 14, 1976 hearing is well documented by the court reporter's transcript of the hearing. The portion of that transcript indicating "Appearances," i.e., the identity of the lawyers appearing for the respective parties, stated that Millard Farmer, "Senior Defender, Georgia Criminal Justice Council," appeared "for the defendants." According to the style of the case, the defendants were petitioner, Henry Willis III, and Larry Donnell Fleming. Farmer was the only lawyer who entered an appearance for these defendants.[33] The prosecutor, in his opening remarks to the court at the beginning of the hearing, referred to Farmer as "counsel for the defendants." Farmer, responding to the prosecutor's opening remarks, said, "I think that is correctly stated."

Eighteen witnesses, twelve called by the State and six by the defendants, testified at the hearing. Their testimony dealt with all three crimes under investigation and all three defendants. Farmer conducted all the defense questioning, as if he represented all three defendants. In short, his actions were completely consistent with his representation of petitioner at that hearing.

We think it important to note that Farmer never suggested to the court or the prosecutor that he was not representing all three defendants at the hearing. Given his vast experience and expertise in criminal law, especially in capital cases such as this one, Farmer knew the significance of "appearing" for all the defendants; he knew that if this were not true, that, for example, he did not represent petitioner, petitioner might well be denied his sixth and fourteenth amendments right to counsel, and the integrity of the State's prosecution of petitioner would be open to question.

---

**30.** We reach this conclusion notwithstanding the fact that no judicial officer had appointed Farmer to represent petitioner. The absence of an official appointment did not preclude Farmer and petitioner from having an attorney-client relationship at that hearing.

**31.** In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir.1982), this court adopted as binding precedent all decisions of Unit B of the former Fifth Circuit handed down after September 30, 1981.

**32.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**33.** The record indicates that Farmer had several assistants sitting with him at the counsel table during the hearing, but it does not inform us who these assistants were or whether they were even lawyers.

Moreover, Farmer knew that if he misled the court as to the true nature of his appearance for the defendants, especially in a case as serious as the one at hand, he might face disciplinary proceedings. The district court did not believe that Farmer misled the state court in this situation; it found that he in fact represented petitioner. The record fully supports the court's finding. Petitioner's claim therefore fails.[34]

## B.

Petitioner claims that his conviction and/or sentence must be set aside because he received ineffective assistance of counsel at both the guilt and penalty phases of his trial in violation of the sixth amendment. *See McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970). Petitioner had the services of two attorneys throughout his prosecution: the court-appointed Edward Parrish, a former state prosecutor and veteran criminal defense lawyer who had tried approximately thirty murder cases in his forty-six years at the bar, and Benjamin Zeesman, retained by petitioner's mother, an equally experienced trial lawyer with forty-five years experience. Both attorneys were intimately familiar with the communities where the crimes were committed and the trial occurred, with the prosecutor assigned to the case, and with the law enforcement officers involved. In fact, Parrish had known the prosecutor for some forty years. This relationship gave Parrish and Zeesman a unique ability to investigate the evidence in the case on an informal basis. The record discloses that these two attorneys conducted a vigorous and thorough defense.

The Superior Court of Tattnall County, Georgia, in whose territorial jurisdiction petitioner had been incarcerated, considered petitioner's ineffective assistance of counsel claim on habeas corpus. The court,

relying exclusively on the transcripts of the proceedings held in petitioner's murder prosecution in the Superior Courts of Lanier and Cook Counties,[35] concluded that his lawyers had done a good job and denied his claim.

When petitioner presented his ineffective assistance claim to the district court, the court concluded that the Tattnall County Superior Court had not adequately developed and decided the facts on which petitioner based his claim and, accordingly, scheduled an evidentiary hearing. *See generally* 28 U.S.C. § 2254 (1982). At the hearing, petitioner's habeas counsel called petitioner's trial attorneys, Parrish and Zeesman, to the stand and questioned them extensively about their pretrial investigation of petitioner's case, their preparation for trial, and their trial strategy. Habeas counsel also elicited testimony on the same points from the state prosecutor. Counsel's final witness was Georgia Bureau of Investigation Agent Greeson. Greeson had participated in the taking of one of petitioner's statements to the police[36] and, thereafter, discovered that petitioner had confessed to his cellmate in the Cook County jail that he kidnapped and murdered Chief Giddens.

Habeas counsel's point in calling Greeson was to show that, contrary to the testimony of Parrish and Zeesman, they had not adequately interviewed Greeson prior to petitioner's trial. Greeson's testimony did not establish this point, however. Although Greeson could not recall the specifics of what he and Parrish may have discussed prior to petitioner's trial, he stated that whatever Parrish said about any conversation they had was correct.

In addition to the testimony of these witnesses, habeas counsel introduced into evidence the affidavits of several witnesses who said they would have given favorable character testimony in petitioner's behalf

---

34. We emphasize that petitioner's sixth and fourteenth amendments claim here is that he was denied counsel at the May 14, 1976 hearing. He makes no claim that if Farmer represented him at the hearing Farmer's performance was inadequate.

35. *See supra* note 1.

36. *See supra* note 12.

at the sentencing phase of the trial but were never contacted by petitioner's lawyers. The State rebutted this evidence with the affidavits of five people who commented on petitioner's character unfavorably.

The district court thus decided petitioner's ineffective assistance of counsel claim based on the live testimony of his trial lawyers, the prosecutor, and Agent Greeson, the affidavits of character witnesses, both favorable and unfavorable to petitioner, and the transcript of petitioner's criminal prosecution that previously had been laid before the state habeas court in Tattnall County.

The district court rejected petitioner's claim. In so doing, the court did not address each specific episode of allegedly ineffective assistance of counsel and did not find the historical facts concerning the episode. Rather, the court picked out a few of petitioner's points, concluded that counsel had acted properly, and then considered counsel's overall performance. The court found that, faced with an "almost hopeless case," petitioner's attorneys had done a "superb job of trying to convince two juries to spare petitioner's life ... [and] rendered more than the effective assistance of counsel that [petitioner] was constitutionally entitled to." The district court, applying the standard of *Washington v. Strickland*, 693 F.2d 1243, 1258 (5th Cir. Unit B 1982) (en banc), *rev'd* — U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (finding Fifth Circuit's standard for establishing ineffective assistance of counsel too low), also found that petitioner had shown no "actual and substantial disadvantage" as a result of counsel's performance, observing that the "mountainous record of evidence proving petitioner's guilt" would make any finding of professional inadequacy harmless beyond a reasonable doubt.

■ The Supreme Court, in *Strickland v. Washington*, —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), prescribed the standard that we must now apply in assessing petitioner's claim. A sixth amendment ineffective assistance of counsel claim has two elements. First, the petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at ——, 104 S.Ct. at 2064. We focus on the professional reasonableness of counsel's assistance under the circumstances, bearing in mind that there are countless ways to provide effective assistance in a given case. *Id.* at ——, 104 S.Ct. at 2066. Second, the petitioner must show actual prejudice. *Id.* at ——, 104 S.Ct. at 2064. Here, the appropriate test is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at ——, 104 S.Ct. at 2068.

We now examine each phase of petitioner's case. In the instances where the district court resolved the salient historical facts, we rely on its findings; where it did not, we treat petitioner's factual allegations as true. For convenience, we decide each episode of alleged inadequate representation by addressing the *Washington* element that most expeditiously disposes of petitioner's claim. *Id.* at ——, 104 S.Ct. at 2069–70.

1.

■ Petitioner points to numerous acts or omissions that he contends constituted ineffective assistance of counsel in the guilt phase of his case. We consider them as they allegedly occurred, chronologically.

a.

Petitioner contends that his attorneys failed to challenge the grand jury array as not representing a fair cross-section of the community. Petitioner's grand jury only assayed probable cause. Once the trial court heard all the evidence and determined that it established a case of malice murder for jury consideration, and once the jury determined that petitioner was guilty beyond a reasonable doubt, petitioner "suffered no possible prejudice" from the grand jury's composition. *Rose v. Mitchell*, 443 U.S. 545, 552, 99 S.Ct. 2993, 2998, 61 L.Ed.2d 739 (1979); *see also Guice v.*

*Fortenberry*, 661 F.2d 496, 498–99 (5th Cir. 1981) (en banc).

Petitioner has not demonstrated the *actual prejudice* required by *Washington*. The record indicates that, had petitioner's attorneys obtained a dismissal of his indictment, the prosecutor would have represented his case to a reconstituted grand jury within weeks and procured another indictment. Thereafter, petitioner would have gone to trial and been convicted on the same overwhelming evidence, presented at the trial, now under scrutiny.

b.

Petitioner contends that Edward Parrish was derelict in his duty for failing to attend the May 14, 1976 discovery hearing before the Cook County Justice of the Peace. Parrish knew about the hearing and attended briefly. He did not stay for the entire proceeding because he already knew what the State's evidence was; petitioner was not going to testify, and Parrish felt that it was in petitioner's best interest not to stay. No portion of the transcript of the May 14 hearing was introduced into evidence at petitioner's trial, either as substantive evidence or for impeachment purposes. Petitioner makes no claim that the hearing, or anything that transpired as a result thereof, prejudiced him in any way at his trial. He thus fails to establish the prejudice element essential to relief under *Washington*.

c.

Petitioner contends that his lawyers erred in failing to request a change of venue from Lanier County, where Chief Giddens' murder took place, because of pretrial publicity and the attitude of the community. Chief Giddens had neither lived nor worked in Lanier County and was not widely known there. As the state habeas court observed, only ten percent of the jurors were excused because of pretrial publicity or bias toward the accused. The

prosecutor, testifying in the district court, said that there was very little pretrial publicity in Lanier County and that the spectators at trial were well behaved. Parrish felt that Lanier County was a good location for the trial and that his considerable experience trying cases there, many as prosecutor, enabled him to choose a "favorable" jury. Moreover, the trial judge had a reputation for fairness. We agree with the district court that, under these circumstances, petitioner's attorneys exercised reasonable professional judgment in deciding not to pursue a change of venue.[37]

d.

Petitioner complains that counsel failed to request a continuance of his trial when, at his arraignment, the prosecutor did not produce a list of the witnesses who would testify in the State's case in chief, as required by Georgia law. Ga.Code Ann. 17–7–110 (1982). The arraignment took place on December 13, 1976, forty-two days before petitioner's trial was to commence. Following the arraignment, the prosecutor gave petitioner's lawyers a tentative list of the State's witnesses, and he supplemented the list as the trial approached, producing his final list about a week before the trial began. There were no surprises; petitioner's lawyers had fully anticipated whom the State's witnesses would be, and they were well prepared to confront them. As Parrish testified in the district court, he had previously spoken with the State's principal witnesses. Those on the list he had not interviewed had little, if any, information about the merits of the case. Petitioner does not contend that the prosecutor's piecemeal production of the State's witness list prejudiced him in any way. His lawyers' failure to move for a continuance thus had no sixth amendment implications.

**37.** Parrish explained, at the evidentiary hearing in the district court, why he moved for a change of venue for petitioner's sentencing retrial. *See supra* note 1. He stated that the notoriety engendered in Lanier County by petitioner's first trial was substantial and did not subside during the interval between that trial and his retrial. He felt that he could not pick a fair jury in Lanier County and therefore requested a change of venue. The court selected Cook County as the retrial site, and Parrish acceded to the court's decision.

e.

Petitioner faults counsel's failure to interview his cellmate in the Brooks County jail, the prosecution's key witness to whom petitioner made an unqualified confession. Long before the trial began, Parrish conferred with the Sheriff of Brooks County, and he knew precisely what the cellmate was going to say. Parrish did not interview the cellmate because, as he explained to the district court, he did not want to tip off his cross-examination strategy. The district court was not impressed by petitioner's criticism of counsel's handling of this situation, perhaps because petitioner neither claimed nor demonstrated any resulting prejudice. Petitioner also criticizes the adequacy of counsel's interview of Georgia Bureau of Investigation Agent Greeson, but, again, he has not explained how counsel's conduct caused him any prejudice. This failure of adequate interview specie of sixth amendment claim accordingly fails.

f.

Petitioner asserts error in counsel's failure to file a *formal Brady* motion seeking the prosecution's disclosure of exculpatory evidence. A formal *Brady* motion was unnecessary in this case, as the prosecutor had already given counsel full access to his file. This is one of the reasons why Parrish considered it unnecessary to attend the May 14, 1976 discovery hearing in Cook County. Petitioner overlooks the fact that his attorneys, at a pretrial conference, made an oral request for any *Brady* material the State might have. The prosecutor responded that he had none. The trial judge ordered the State to turn over any *Brady* material that subsequently might appear, and the prosecutor, as far as we can discern, did so. Petitioner's *Brady* claim is frivolous.[38]

38. *See supra* note 22.

39. *Id.*

40. Petitioner made no claim in the state trial court, and makes none now, that the police

g.

Petitioner faults counsel's performance at trial in several respects. We discuss his points in order.

i.

Petitioner asserts that counsel failed to object to the court's excusal of several veniremen consciously opposed to capital punishment. As we have indicated in the margin,[39] each of these veniremen were properly excused under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); consequently, counsel's failure to object caused petitioner no prejudice.

ii.

Petitioner asserts that counsel failed adequately to investigate and prepare for the *Jackson-Denno* hearing the trial court convened during the State's case in chief to determine the voluntariness, and therefore the admissibility,[40] of the post-arrest statements petitioner gave to law enforcement officers on February 12 and 15 and twice on February 16, 1976. (In our recitation of the facts in Part I.B. *supra,* we cite only the February 12 statement and the second statement of February 16, because they were the only ones introduced at the guilt phase of the trial.) The gist of petitioner's claim is that counsel failed to interview the police officers present at the scene of petitioner's arrest and, therefore, did not learn that fifteen police cars and thirty policemen converged on the site within a matter of minutes, that the atmosphere was emotionally charged, and that an officer punched one of petitioner's accomplices in the stomach and kneed him in the face. Petitioner conjectures that, had counsel interviewed these officers, counsel would have summoned them to testify at the *Jackson-Denno* hearing to portray the arrest scene and convince the court that the events which took place there intimidated petitioner to

failed to caution him, as required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), before they interrogated him and took his statements. *See supra* note 12.

such an extent that his subsequent statements to the police were involuntary.

The record does not support petitioner's claim. First, there is no evidence indicating that counsel failed to interview the officers. At his evidentiary hearing in the district court, petitioner neither pursued the point in questioning Parrish and Zeesman nor established it through other testimony. Second, the allegations his trial counsel made in their motion to suppress petitioner's statements strongly suggest that counsel had questioned someone who was at the scene of petitioner's arrest. Counsel recited the events which took place there and alleged that the statements petitioner subsequently gave the police were the product of the fear engendered by the hostile atmosphere which permeated the arrest scene.[41]

At the *Jackson-Denno* hearing, the prosecutor presented the four statements petitioner had given the police. As we have set forth in the margin, *see supra* note 12, they were the February 12 oral statement to Detective Register and Sheriff Gaskins; the February 15 tape-recorded statement to Agent Greeson; the February 16 tape-recorded statement to Detective Register and Sheriff Gaskins; and the subsequent February 16 oral, unrecorded statement to Sheriff Alderman. Petitioner's lawyers did not object to three of these statements (the first, second, and fourth), because they considered them exculpatory, and thus introduced no evidence to indicate that they were involuntary. In fact, they used these statements to argue to the jury that petitioner's two accomplices had forced petitioner to take part in their crime spree against his will. The lawyers only objected to petitioner's tape-recorded February 16 statement to Detective Register and Sheriff Gaskins. This statement was most damaging to petitioner because it contained so many inconsistencies and vacillations that it appeared to be unbelievable. Counsel claimed that the interrogators' method

of questioning petitioner was deceptive and confusing and tended to put words in his mouth, and they thus urged the court to exclude the statement as the product of improper police conduct. At the close of the hearing the trial judge held the statement voluntary and therefore admissible. He added, however, that, if the prosecution offered the statement into evidence, he would entertain defense objections to the interrogators' questions that appeared to be leading or testimonial in nature. The prosecutor subsequently decided not to introduce the statement.[42]

Our examination of the trial transcript convinces us that defense counsel's strategy, in objecting only to the first February 16 statement, was entirely reasonable. Petitioner's other statements, two of which were presented to the jury,[43] provided the foundation for counsel's closing argument that petitioner, normally a law-abiding person, was himself the victim of two hotheaded accomplices, who took undue advantage of him. Without these statements in evidence, this defense argument would have been little more than speculation and, in the face of the prosecution's strong case, perhaps worthless.

iii.

Petitioner contends that counsel acted incompetently when they placed him on the witness stand and allowed him to present an alibi, because the prosecutor was prepared to, and did, thoroughly impeach his story. As the state habeas court and the district court below have both made clear, counsel faced the unenviable task of defending an almost hopeless case. The State's evidence of guilt was overwhelming. Counsel went forward with petitioner's alibi defense because petitioner insisted that his alibi was true. We cannot label defense counsel professionally incompetent under these circumstances for having their client present testimony which, if believed, would make out an absolute defense.

---

**41.** Petitioner's lawyers initially thought that his statements to the police resulted from the charged atmosphere which permeated the scene of his arrest. Their subsequent investigation disclosed that such was not the case.

**42.** *See supra* note 12.

**43.** *Id.*

iv.

Petitioner faults counsel for failing to object to several allegedly improper and inflammatory comments made by the prosecutor in his final summation to the jury. We have examined the comments in question and conclude that their propriety was debatable and that objections could have backfired on the defense. Counsel's heat-of-trial decisions not to object are understandable here. Even in hindsight, we cannot fault them. *See Strickland v. Washington,* —— U.S. at ——, 104 S.Ct. at 2065. We find no attorney error.

2.

Petitioner points to numerous acts or omissions that he contends constituted ineffective counsel in the penalty phase of his case. We address these claims chronologically as they allegedly occurred.

a.

Petitioner contends that his attorneys failed to investigate for mitigating evidence and prepare for the penalty phase of his trial. His habeas counsel extensively examined Parrish and Zeesman on this issue in the district court. Zeesman testified that he was responsible for investigating the alibi and character witnesses for the defense. Unfortunately, Zeesman suffered a stroke and a heart attack after the penalty trial, and, as a result, could not remember many details of his investigation. Zeesman did recall, however, contacting several potential witnesses in Valdosta who were antagonistic toward petitioner and thus were not subpoenaed. Further investigation led to nothing favorable. Petitioner's past employer, for example, thought petitioner ought to be executed for murdering Chief Giddens. Petitioner's mother declined to testify. Petitioner's father had never supported his family, and for that reason he lacked credibility. Other family members also presented credibility problems. The only favorable character witness defense counsel could uncover was Sheriff Alderman. Petitioner considered him a friend and sent for him shortly after he was arrested. Petitioner told Alderman that his accomplices had forced him to participate in the kidnapping and murder of Chief Giddens.

As a result of this investigation, defense counsel decided to use Sheriff Alderman as their character witness. The State called Alderman for other purposes, and the defense, on cross-examination, brought out that petitioner cried while telling him about the murder; that petitioner usually told the truth; that he respected and obeyed law enforcement officers; and that he had never been charged with a serious felony. Petitioner's testimony on these points was consistent with Sheriff Alderman's.

To rebut Zeesman's testimony, petitioner's habeas counsel presented the affidavits of seven potential character witnesses. These potential witnesses were a fire chief, a retired school teacher, a deputy sheriff and four members of petitioner's family. The district court accorded no significance to the witnesses who were unrelated to petitioner. All the fire chief could say was that petitioner had been a trusted part-time employee in the 1950's. The retired school teacher and the deputy sheriff lived in Rochelle, Georgia, sixty miles from Moultrie, petitioner's home, and had little contact with petitioner.

The State countered these affidavits with the affidavits of four law enforcement officers and a civilian. They said that petitioner was a liar, a fighter, and a drunk; that he had an explosive, violent temper, and that he frequently carried a weapon.

The district court, considering this affidavit testimony in the context of what Zeesman had said, concluded that there was a paucity of mitigating character evidence available to the defense. The court also concluded that petitioner's attorneys, in preparing for the penalty phase of the trial, had rendered competent professional service. Petitioner has not persuaded us that the district court erred in drawing these conclusions.

b.

Petitioner contends that his attorneys erred in failing to obtain an adequate change of venue for his sentencing trial, which took place almost a year after his

guilt/innocence trial. Petitioner's attorneys moved the court for a change of venue because of the attitude of the community. The trial court granted their motion and moved the sentencing trial site to Cook County, ten miles away. Petitioner now criticizes this as insufficient and contends that counsel should have obtained still another change of venue.

Cook County is a relatively small rural county. Parrish was very familiar with the community attitudes in Cook County because he and his family had lived there for several generations. Parrish had a successful practice in the county seat and was very active in the community. Accordingly, he felt very comfortable choosing a jury there. *Strickland v. Washington,* —— U.S. ——, —— – ——, 104 S.Ct. 2052, 2065–66, 80 L.Ed.2d 674 (1984), holds that a federal habeas court "must indulge a strong presumption that [defense] counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Petitioner did not overcome this presumption in presenting this claim of error.

c.

Petitioner criticizes his counsels' voir dire of the jury venire and their failure to object to the trial judge's disqualification, on the prosecutor's challenge for cause, of certain veniremen pursuant to *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). We find no cause for criticism. Attorney Parrish had been practicing law in the general vicinity of Cook County for forty-six years. As the record of the evidentiary hearing in the district court indicates, he was very familiar with the venire summoned to try petitioner's case. Parrish utilized this knowledge in deciding whether to strike or accept a particular venireman. Under these circumstances, his inquiry of the venire was more than adequate. With regard to petitioner's *Witherspoon* point, we have found that no jurors were impermissibly disqualified.[44]

This aspect of petitioner's claim borders on the frivolous.

d.

Petitioner faults his attorneys for failing to object to certain allegedly irrelevant, prejudicial, and inflammatory questions the prosecutor put to certain witnesses and some comments he made to the jury in opening statement and in closing argument. When viewed in light of the totality of the circumstances, these complaints are inconsequential and petty. Most of the prosecutor's actions simply were not objectionable. Defense counsel are allowed a considerable breadth of discretion in choosing their trial strategies. *Strickland v. Washington* —— U.S. at —— – ——, 104 S.Ct. at 2065–66, commands, as we have pointed out, that we presume, in the context presented here, that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. Petitioner has failed to overcome that presumption.

e.

Petitioner asserts that Mr. Parrish was ineffective in telling the jury during closing argument that he did not believe petitioner's testimony that he was beaten by the police following his arrest. Parrish did make this comment, which on its face seems contrary to his client's interest, but he was justified in doing so.

Petitioner made the statement about the beating while he was on the witness stand, on direct examination, relating his alibi. Parrish did not elicit the statement about the beating; rather, petitioner volunteered it in trying to explain away his statements to the police that he had been with Larry Fleming and Willis when Chief Giddens was murdered. Up to this point in the trial there had been no evidence even remotely suggesting that the police had mistreated petitioner at any time. In fact, the evidence was to the contrary; the police had dealt with petitioner quite fairly, and he had never complained about their treatment of him.

**44.** *See supra* note 22.

In his closing argument to the jury, Parrish addressed this conflict in the evidence; it was in this context that he made the comment petitioner now challenges. Parrish's point to the jury was that petitioner had made the statement, about the beating, out of sheer desperation and fear for his life. Petitioner had been in jail almost two years, and Parrish suggested that the pressure on him was so great that he was willing to say anything to save his life. In short, Parrish was asking the jury not to hold the allegation of police misconduct against his client.

The district court based its finding of no sixth amendment violation in this instance solely on the record of petitioner's penalty trial; accordingly, we do not apply the clearly erroneous rule to the court's decision. Rather, we review the same cold record to determine whether defense counsel satisfied the test laid down by *Washington*. We conclude, in *Washington*'s words, that counsel made no error "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," —— U.S. at ——, 104 S.Ct. at 2064, and that there is no reasonable probability that, had counsel not made the challenged comment, "the result of the proceeding would have been different." *Id.* at ——, 104 S.Ct. at 2068.

f.

Petitioner's final objection to his lawyers' performance concerns counsel's statement in closing argument that:

I hope this case goes not into the Federal Courts, we've always stuck to our state court, but we've got to represent our client—that's all there is to it, and especially when we feel an injustice done. We hope it stops here.... But, we say don't take his life. Be on the safe side, you're always safer to give the life sentence.

Petitioner argues that this statement improperly informed the jury that petitioner could seek relief in the federal courts following the imposition of the death penalty and led the jury to believe that petitioner might not be executed even if the jury sentenced him to death.

Viewing counsel's argument as a whole in the light of everything that had transpired before the jury, we cannot say that the mere knowledge that petitioner's case might wind up in federal court led the jurors to take their sentencing responsibility lightly. *Corn v. Zant,* 708 F.2d 549, 557 (11th Cir.1983); *but cf. Prevatte v. State,* 233 Ga. 929, 214 S.E.2d 365, 367 (1975) (the "inevitable effect" of the prosecutor's emphasis on the defendant's right to an automatic appeal was "to encourage the jury to attach diminished consequence to their verdict"). Counsel's statement certainly did not affect the outcome of petitioner's sentencing proceeding.

■ In summary, we are not persuaded by petitioner's argument that attorneys Parrish and Zeesman rendered him ineffective assistance of counsel. Petitioner's examples of professional dereliction dissolve away under close scrutiny, leaving at best a handful of colorable claims. A defense attorney is not ineffective solely because his client is sentenced to death. "Intrusive post-trial inquiry into attorney performance," such as that which has been required in this case, may "dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client." *Washington v. Strickland,* —— U.S. at ——, 104 S.Ct. at 2066. Counsel's performance, here, ensured a fundamentally "fair trial" which "produced a just result." *Id.* at ——, 104 S.Ct. at 2064. There is no reason to set aside petitioner's conviction or his penalty on account of the representation he received.

C.

Petitioner contends that the eighth amendment, as interpreted by the Supreme Court in *Edmund v. Florida,* 458 U.S. 782, 801, 102 S.Ct. 3368, 3379, 73 L.Ed.2d 1140 (1982), foreclosed the imposition of the death penalty in his case because of "the absence of proof that [petitioner] killed or attempted to kill ... or contemplated that life would be taken." Petitioner premises

this argument on two fragments of the instructions the trial judge presented to the jury at the close of the guilt phase of his trial. The first involves the concept of felony murder; the second concerns conspiratorial liability. Petitioner postulates that the jury may have convicted him of Chief Giddens' murder without believing that he "kill[ed], attempt[ed] to kill, or intend[ed] that a killing take place or that lethal force be employed," *id.* at 797, 102 S.Ct. at 3376, because Giddens' murder may have been the product of a felony, kidnapping with bodily injury, or a conspiracy in which petitioner participated. The jury returned a general verdict of guilty; accordingly, petitioner argues, his thesis cannot be refuted.

*Edmund* does not require an explicit finding by the sentencer (court or jury) that the defendant "kill[ed], attempt[ed] to kill, or intend[ed] that a killing take place or that lethal force be employed" before the death penalty can be imposed. What is important is that the sentencer be satisfied the evidence establishes the defendant's involvement in the murder to the extent *Edmund* requires. If the sentencer is not, or could not be, so satisfied, *Edmund* deems the death penalty unreasonably disparate and thus forbids its imposition.

In determining whether an *Edmund* violation has taken place we first look to the instructions under which the jury received the case at the conclusion of the guilt phase of the trial. If, for example, the jury was instructed that it could not find guilt unless it found that the defendant committed malice murder, which in Georgia requires that the defendant caused the victim's death with malice aforethought, and it found the defendant guilty as charged, the *Edmund* inquiry would end.[45] If, however, the jury received the case under instructions that would authorize it to base guilt on malice murder *or* felony murder *or* conspiratorial murder, then, in order to sustain the death penalty, we must determine whether the theory under which the parties argued the case to the jury and the proof were such that we can safely say that the jury found the defendant guilty of malice murder. If we cannot make that determination, then the only way a death penalty can be imposed is if the sentencing jury (or judge, if the judge is the true sentencer)[46] explicitly finds malice murder. Such was not the case here. We therefore turn to the guilt-phase jury charge to determine if the jury received the case under the multiple liability theories petitioner has posed and, if so, whether the theory under which the parties argued the case to the jury and the proof nevertheless led the jury to conclude that petitioner was guilty of malice murder.

1.

The indictment in this case charged petitioner solely with malice murder. The court instructed the jury to that effect and proceeded to inform the jury about the elements of malice murder. In doing so, the court made a brief reference to felony murder. That reference was embedded in the following instruction:

Now, the charge here is murder. Now, a person commits murder when he unlawfully, and with malice aforethought, either expressed or implied, causes the death of another human being.

Now, expressed malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifest by external circumstances capable of proof. Now, malice shall be implied where no considerable provocation appears, and where all of the circumstances of the killing show an abandon and malignant heart.

*Now, a person also commits the crime of murder when in the commission of a felony he causes the death of*

---

45. A finding of guilt would not, of course, preclude a *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 2791–92, 61 L.Ed.2d 560 (1979), challenge that the evidence was not sufficient for a rational trier of fact to find the petitioner guilty of malice murder beyond a reasonable doubt.

46. In Florida, for example, the trial judge is the sentencer, the jury serving only in an advisory capacity. Fla.Stat. § 921.141 (1983).

*another human being, irrespective of malice.*

Now, before you would be authorized to find the Defendant guilty of the offense of murder, you must find and believe beyond a reasonable doubt that the Defendant did, with malice aforethought, either expressed or implied, cause the death of James Edward Giddens.

And, I charge you that if you find and believe that at any time prior to the date this Indictment was returned into this court, that the Defendant did, in the County of Lanier, State of Georgia, with malice aforethought, kill and murder James Edward Giddens in the way and manner set forth in the Indictment, then you would be authorized to find the Defendant guilty of murder.

(Emphasis added.)

■ Petitioner argues that the italicized portion of this instruction authorized the jury to find him guilty of felony murder without determining that he intended to kill the victim. We are not persuaded. "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in context of the overall charge," *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973), and in light of what the jury heard and saw as the trial progressed, from beginning to end. *Lamb v. Jernigan,* 683 F.2d 1332, 1339 (11th Cir.1982), *cert. denied,* 460 U.S. 1024, 103 S.Ct. 1276, 75 L.Ed.2d 496 (1983).

Immediately preceding its reference to felony murder, the court instructed the jury concerning malice murder and how "malice aforethought" can be demonstrated. Immediately following the reference, the court instructed the jury that it must find malice before it would be authorized to find the defendant guilty of malice murder. The mandatory prerequisite of malice con-

sequently rendered the reference to felony murder meaningless.

The jury's verdict of "guilty as charged" confirmed the finding of malice. The jury had the indictment during deliberation, knew that the indictment charged petitioner only with malice murder, and knew, from the court's instruction, that it could not convict petitioner absent a finding of "malice aforethought." The erroneous reference to felony murder, therefore, was mere harmless surplusage.

■ Petitioner contends that this does not end the inquiry because the court also referred to conspiracy liability for murder in charging the jury. The court said, "Where a conspiracy is shown the act of one becomes the act of all insofar as the furtherance of the conspiracy is concerned, and each is as fully responsible for the act of the other in carrying out the common purpose as if he, himself, had committed the act." This instruction, standing alone, did not violate the *Edmund* rule; for implicit in the instruction was the requirement that the jury find that the murder under consideration was the "common purpose," i.e., the intended object, of the conspiracy. To remove any doubt, the court instructed the jury further, informing it that it could not convict the defendant, as a conspirator, unless it found that he intended the victim's killing.[47] The court's challenged conspiracy instruction therefore did not contravene the *Edmund* rule.

As we stated *supra,* these conclusions regarding felony and conspiratorial murder should end the *Edmund* inquiry. We nonetheless proceed, in subparts 2 and 3 *infra,* to demonstrate that the parties' arguments to the jury and the proof before it did not lead the jury to impose an unlawful sentence.

**47.** The court twice charged the jury as follows:

Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime. A person is concerned in the commission of a crime *only if* he, No. 1: *Directly commits* the crime; or No. 2: *Intentionally* causes some other person to commit the crime under such circumstances that the oth-

er person is not guilty of any crime either in fact, or because of legal incapacity; or; No. 3: *Intentionally* aids or abets in the commission of the crime; or No. 4: *Intentionally* advises, encourages, hires, counsels or procures another to commit the crime. In other words, if they did any one of those four things they would be conspiring together.

(Emphasis added.)

## 2.

The prosecution, in both its opening and closing arguments to the jury, presented a single theory of the case, that petitioner shot at Chief Giddens three times with the officer's .38 caliber service revolver. The prosecutor based this theory on petitioner's confession to his cellmate in the Cook County jail. The defense, in its closing, said that the jury had three scenarios before it: petitioner was not at the scene of the crime; he participated in the kidnapping and murder but did so against his will and thus could not be found guilty; he committed malice murder, as the prosecution contended.

The prosecutor did mention conspiracy, but only within the context of a voluntary, joint enterprise: "If me and one other person kidnapped a person and killed him and if I'm driving the car or if I'm pulling the trigger, or whatever, both of us are guilty just like the other." The defense counsel clarified the prosecutor's remarks with these words: "There must be an agreement [to do something], and it's up to the state to prove that agreement before you're responsible for what someone else does." They continued, "Now a man can't be charged with conspiracy to kill when he's pleading with the ones that did the killing not to do it. That's just not the law. It's not even remotely close to it. A conspiracy must be an agreement to go ahead and do an illegal act." It appears plain to us that the conspiracy liability the parties were addressing is not the sort of intent-less vicarious killing *Edmund* condemns.

None of the lawyers mentioned felony murder in addressing the jury. In fact, the prosecutor cautioned the jury that petitioner was not on trial for armed robbery or kidnapping and reminded it that he had introduced evidence of those crimes only to show petitioner's motive for the murder. The prosecutor emphasized that "we're not trying a man who wasn't involved [in the murder], who wasn't there. We're not trying some abstract theory."

In sum we find nothing in the parties' submission of the case to the jury that would lead us to conclude that the jury would have been authorized, under the court's instructions, to find petitioner guilty of felony murder or conspiracy murder.

## 3.

The evidence in this case presented, as the defense stated in its closing argument, three mutually exclusive scenarios. First, petitioner and his accomplices shot Chief Giddens to death with his .38 caliber service revolver and a .22 caliber pistol. Second, Willis and Larry Fleming kidnapped Chief Giddens and forced petitioner, against his will, to drive them to the murder scene. En route petitioner, and Giddens, pleaded that Willis and Fleming spare Giddens' life. Willis and Fleming then instructed petitioner to stop the car; Willis and Fleming got out, taking Giddens with them, and went off into the swamp. Petitioner, remaining behind, continued to beg for Giddens' life. Willis and Fleming then shot the Chief and left him in the swamp. Third, petitioner was not involved in the robbery, kidnap, or murder; he was in Valdosta visiting his uncle at the time.

The first of these scenarios, the one the State urged the jury to accept, was established through the testimony of petitioner's cellmate, to whom petitioner confessed shortly after he was arrested and placed in the Cook County jail. The second scenario, which petitioner's counsel urged the jury to accept if it rejected the third one, was established by petitioner's statement to the police on February 16. The third scenario, the alibi, was established by petitioner's statement to the police on February 12 and his testimony on the witness stand.

In finding petitioner guilty of murder, the jury had to reject the second and third scenarios, which portrayed him as an innocent man, and adopt the first one. That scenario described a pure malice murder and fully satisfied *Edmund*'s intent standard.

We draw three conclusions in analyzing petitioner's *Edmund* claim. First, the indictment charged petitioner with malice murder only, and the court instructed the jury that it had to find all of the elements

of malice murder, including intent to kill, to convict him. Second, the parties, in their closing arguments, did not treat the prosecution as one for felony or conspiratorial murder. Third, the jury's verdict could not have been based on felony or conspiratorial murder to the exclusion of malice murder.

## III.

We find no constitutional error in petitioner's conviction or sentence. Accordingly, we affirm the judgment of the district court.

AFFIRMED.

TUTTLE, Senior Circuit Judge, concurring in part and dissenting in part:

I concur in Parts II-B and C of the Court's opinion. With deference, I dissent from Part II-A and the final disposition of affirmance.

I cannot agree with the conclusion that the petitioner was not deprived of the assistance of counsel at a critical stage in the prosecution against him for murder. In my view, the petitioner was the subject of a committal hearing on the murder charge, as provided by Ga.Code Ann. §§ 17–7–20 *et seq.*, at which he was not represented by counsel. That hearing was a critical stage of the State's prosecution of the petitioner for murder, and reversal of the petitioner's conviction is therefore automatic under *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978).

### (a) *Standard of Review*

The district court's conclusions that the petitioner was not the subject of a committal hearing at which he was unrepresented and that, even if it were a committal hearing, he was represented by his co-defendants' attorney, Millard Farmer, are mixed questions of law and fact which are freely reviewable. *See Strickland v. Washington*, —— U.S. ——, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984); *Baty v. Balkcom*, 661 F.2d 391, 394–95 n. 7 (5th Cir. Unit B 1981), *cert. denied*, 456 U.S. 1011, 102 S.Ct.

2307, 73 L.Ed.2d 1308 (1982).[1] These conclusions are more than simply findings of primary or historical fact. They are also conclusions as to the Sixth and Fourteenth Amendment implications of such facts. In any event, even if this were an appropriate case for deferential review, in my view the record amply demonstrates that these conclusions by the district court were clearly erroneous.

### (b) *The Committal Hearing*

Under Georgia law, a committal hearing may be held to determine if probable cause exists to believe an accused guilty of an offense charged and, if so, to bind him over to a grand jury for indictment. *Neal v. State*, 160 Ga.App. 498, 499, 287 S.E.2d 399 (1981). Such a hearing is not a required step in a criminal prosecution and is obviated once an indictment issues for the crime charged. *State v. Middlebrooks*, 236 Ga. 52, 55, 222 S.E.2d 343 (1976); *Sims v. State*, 148 Ga.App. 733, 733, 252 S.E.2d 910 (1979). Nor is an adversarial hearing constitutionally necessary in order to make a probable cause determination. *Gerstein v. Pugh*, 420 U.S. 103, 120, 95 S.Ct. 854, 866, 43 L.Ed.2d 54 (1975).

However, when such a hearing is provided, at which a suspect is afforded an opportunity to cross-examine the prosecution's witnesses, it constitutes a "critical stage" in the prosecution, at which the suspect is constitutionally entitled to the assistance of counsel. *Coleman v. Alabama*, 399 U.S. 1, 9, 90 S.Ct. 1999, 2003, 26 L.Ed.2d 387 (1970); *State v. Hightower*, 236 Ga. 58, 59, 222 S.E.2d 333 (1976). It makes no difference that the suspect may not have been entitled to such a hearing. So long as one is held, he is entitled to the assistance of counsel. *Coleman*, 399 U.S. at 8–10, 90 S.Ct. at 2002–2004. In my mind, there is no question that this was a committal hearing as to the petitioner. Indeed the prosecutor, in his opening remarks at the hearing said as much:

Judge, the proceeding we're here for today is for a committal hearing in Cook

---

**1.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), the court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

County, on charges against Larry Donnell Fleming and Henry Willis, III., charged with the offense of armed robbery of Farrell Kent, and also the armed robbery ˙ charge against Henry Willis, III., charging him with the armed robbery of another place here in Cook County. By agreement of counsel and by stipulation, and this is subject to correction by counsel for the Defendants, *we are also having a committal hearing before this Court with respect to the charges which are pending in Lanier County, Georgia, charging the Defendants, Larry Donnell Fleming, Son H. Fleming and Henry Willis, III., with the offense of murder of James Edward Giddens.*

(Emphasis added.)

Although the magistrate in the habeas proceeding below made a proposed finding that the May 14, 1976, proceeding was a committal hearing, the district court chose instead to characterize it as an "agreed upon discovery conference." [2] The court apparently arrived at this conclusion on the ground that a committal hearing was unnecessary because the petitioner was already under indictment on the kidnapping charges in Berrien County.

This is entirely beside the point. In the first place, if the kidnapping charges had been disposed of in any way favorable to the petitioner—such as by an acquittal—prior to the return of an indictment on the murder charge, the evidence developed at the May 14 hearing would certainly have provided the prosecution with sufficient probable cause to bind the petitioner over to the Lanier County grand jury on the murder charges. As the prosecutor stated in his opening remarks at the May 14 hearing, a committal hearing was unwarranted only as to the kidnapping charges, and it was as to those charges alone, on which an indictment had been returned, that the hearing was solely for discovery purposes.

Second, the May 14 hearing, however the district court chooses to characterize it, was precisely the sort of proceeding which was at issue in *Coleman v. Alabama.* Indeed the Supreme Court there found the Alabama preliminary hearing to be a critical stage in the prosecution precisely because it was a proceeding at which the prosecution's witnesses could first be subjected to cross-examination:

> Plainly the guiding hand of counsel at the preliminary hearing is essential to protect the indigent accused against an erroneous or improper prosecution. First, the lawyer's skilled examination and cross-examination of witnesses may expose fatal weaknesses in the State's case that may lead the magistrate to refuse to bind the accused over. Second, in any event, the skilled interrogation of witnesses by an experienced lawyer can fashion a vital impeachment tool for use in cross-examination of the State's witnesses at the trial, or preserve testimony favorable to the accused of a witness who does not appear at the trial. Third, trained counsel can more effectively discover the case the State has against its client and make possible the preparation of a proper defense to meet that case at the trial. Fourth, counsel can also be influential at the preliminary hearing in making effective arguments for the accused on such matters as the necessity for an early psychiatric examination or bail.

399 U.S. at 9, 90 S.Ct. at 2003.

Thus, I would conclude that the May 14 hearing was the sort of preliminary hearing which the Supreme Court has held to be a critical stage in a criminal prosecution.

It is also clear to me that the petitioner was a subject of the committal hearing. This, too, is obvious from the prosecutor's opening remarks quoted above. The petitioner was present at the hearing, sitting at counsel table.[3] Statements which the peti-

---

**2.** The magistrate concluded, as I do, that the petitioner was subjected to a committal hearing without counsel and that reversal of his murder conviction is therefore automatic. The district

judge rejected the magistrate's proposed findings and recommendations in their entirety.

**3.** Indeed, it appears that the state compelled his presence despite the insistence of his attorney as

tioner had made in response to police interrogation were introduced into evidence by the state. Prosecution witnesses testified against the petitioner as well as against his co-defendants and pointed him out when asked to identify the person about whom they were testifying. In the face of these facts, prosecutor Vickers Neugent's bald after-the-fact assertion that the petitioner was not participating because his attorney on the kidnapping charge had declined to participate is not worthy of consideration. In my view, it simply cannot seriously be contended that the petitioner was not a subject of this committal hearing as to the Lanier County murder charges, for purposes of constitutional inquiry.

Since this was a committal hearing on the murder charge against the petitioner, the critical questions are whether the petitioner was represented by counsel at the hearing and, if not, whether he effectively waived his right to the assistance of counsel.

The respondent argues that, at the time of the committal hearing, the petitioner was represented with respect to the murder charge either by Edward Parrish, who had been appointed to defend the petitioner against the kidnapping charge in Berrien County; or by Millard Farmer, who represented the petitioner's co-defendants, Larry Donnell Fleming and Henry Willis, III, in the committal hearing. In my view, it is clear that neither of these attorneys represented the petitioner at the time of the committal hearing with respect to the murder charge on which he was ultimately tried and convicted.

In the first place, at the time of the committal hearing, Mr. Parrish had never been appointed to defend the petitioner against the Lanier County murder charge, and the district court's finding to the contrary is clearly erroneous. He had been

appointed by Judge H.W. Lott sometime in late April 1976 to defend the petitioner against the kidnapping charge, for which the petitioner had already been indicted.[4] An arraignment was had on that charge on April 30, 1976, and trial was scheduled for mid-June, 1976. At that time it was clear that no action could be taken on the murder charges in Lanier County until that county's grand jury reconvened in September 1976.

Meantime, Mr. Parrish was certain, as well as relieved, as he testified at the habeas proceeding, that he had not been appointed with respect to the murder charge. Indeed, when in August 1976 it was apparent that the petitioner had not yet been able to retain counsel, Judge Lott appointed one Reese Franklin to represent the petitioner in his murder trial. Thus, clearly, the judge who had appointed Mr. Parrish in April was not under the impression that Mr. Parrish had been appointed to represent the petitioner with respect to anything other than the kidnapping charge. It was only after Mr. Franklin was disqualified that Judge Lott, on August 24, 1976, appointed Mr. Parrish on the petitioner's murder charge because of Mr. Parrish's familiarity with the case. By that time it was clear that the state was not going to proceed on the kidnapping charge until after the far more serious murder charges had been disposed of, if at all.

Thus, in my view, the record simply does not support the district court's conclusion that Mr. Parrish was the petitioner's attorney with respect to the murder charge. That he was specifically appointed as his attorney with respect to a related charge is immaterial. He had not been appointed to represent the petitioner against the murder charge, and thus he was not petitioner's counsel with respect to that charge at the

to the kidnapping charge, Edward Parrish, that neither he nor the petitioner was to participate. Vickers Neugent, the district attorney, acknowledged at the habeas hearing that, he had told Mr. Parrish that the petitioner would be at the committal hearing whether he or his counsel chose to participate or not.

4. Although Mr. Parrish has testified that he thinks he had been appointed with respect to the armed robbery charges in Cook County, it is clear to me from the entirety of his testimony that he was confusing the armed robbery and kidnapping charges and was referring to whichever charge the petitioner was under indictment for, *i.e.*, the kidnapping charge.

time of the committal hearing. Nor did he in any way undertake to assume such a representation. He specifically declined to participate in the hearing beforehand and attended only a part of it, as a spectator.

The majority has concluded that, even if this were a committal hearing on the murder charges pending against the petitioner, the petitioner was in fact represented at the hearing by Millard Farmer, counsel for the petitioner's co-defendants. With this I cannot agree.

It is true that the transcript of the hearing refers to Millard Farmer as counsel "for the Defendants" and that prosecutor Neugent in his opening remarks likewise referred to Mr. Farmer as "counsel for the Defendants." It is also true that Mr. Farmer is not reported to have made any clarification to the court about his status with respect to the petitioner. Nor does the transcript indicate that either the petitioner or Mr. Parrish attempted to correct the record on this point.

Be that as it may, the record of the proceeding below amply demonstrates that Millard Farmer did not represent the petitioner at the committal hearing and that in fact he could not have represented him, owing to a conflict of interest between the petitioner and his co-defendants.

It is undisputed that Mr. Farmer sought the committal hearing only on behalf of the petitioner's co-defendants and that Mr. Neugent, the prosecutor, knew that he did not represent the petitioner. Prior to the hearing, the court-appointed attorney for Larry Fleming, the petitioner's co-defendant, asked that Mr. Farmer assist in Larry Fleming's defense. Larry Fleming in turn asked Mr. Farmer to represent Henry Willis as well, to which Mr. Farmer agreed. Mr. Farmer then contacted Mr. Neugent on behalf of the petitioner's co-defendants to arrange for a committal hearing. Mr. Neugent, in turn, contacted Mr. Parrish to advise him that a committal hearing was being arranged. Mr. Parrish insisted that neither he nor his client would participate. Despite this, Mr. Neugent informed Mr. Parrish that the petitioner would be brought to the hearing whether or not he and his counsel were formal "participants."

The prosecutor thus proceeded against the petitioner, as well as against his co-defendants, knowing that the petitioner's court-appointed attorney was not participating and that the petitioner was not otherwise represented by counsel. That this critical stage in the petitioner's murder prosecution was permitted to go forward without any representation on the petitioner's behalf was thus directly attributable to the state, through its district attorney. *Cf. Cuyler v. Sullivan,* 446 U.S. 335, 343, 100 S.Ct. 1708, 1715, 64 L.Ed.2d 333 (1980) (state unconstitutionally deprives defendant of liberty where it obtains conviction through trial at which defense counsel does not provide adequate legal assistance).

In any event, Millard Farmer could not have properly represented both the petitioner and his co-defendants because of an actual and substantial conflict of interest which had already been manifested in their respective statements to the police. So long as an actual conflict of interest exists between jointly represented co-defendants, which adversely affects the adequacy of one or more defendants' representation, there is a denial of counsel which necessitates reversal without further inquiry into prejudice. *See Cuyler,* 446 U.S. at 349–50, 100 S.Ct. at 1718–19; *Glasser v. United States,* 315 U.S. 60, 76, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942).

Our Court has adopted a test for determining whether a conflict of interest exists between co-defendants:

> A conflict of interest is present whenever one defendant stands to gain significantly by counsel adducing probative evidence or advancing plausible arguments that are damaging to the cause of a co-defendant whom counsel is also defending.

*Turnquest v. Wainwright,* 651 F.2d 331, 333 (5th Cir., Unit B, 1981); *Foxworth v. Wainwright,* 516 F.2d 1072, 1076 (5th Cir. 1976).

The statements made by Larry Fleming to the police after the arrest of the three

defendants plainly contradict those made by the petitioner. Moreover, it is clear from the two defendants' statements that each was seeking to incriminate the other in order to exculpate himself. *Cf. Johnson v. Hopper*, 639 F.2d 236, 237 (5th Cir.), *cert. denied*, 454 U.S. 1010, 102 S.Ct. 548, 70 L.Ed.2d 412 (1981); *Foxworth*, 516 F.2d at 1077 (where no one other than defendants witnessed murder, substantial possibility that one defendant would further own defense by placing sole responsibility on another).

Thus, in a statement made and signed on February 16, 1976, the petitioner stated, concerning the murder of Chief Giddens:

> We stopped the car and Larry and the other boy told the policeman to get out and Larry had the policeman's gun and the other boy had a .22 pistol. The policeman got out of the car and started running out into a pond and Larry and the other boy were shooting at him and the policeman hollered that he was hit. Larry and the other boy then said we can't leave him like this and they waded out in the pond and I heard some more shots that sounded like they come from the .22 pistol.

Larry Fleming, on the other hand, said in a statement dated February 12, 1976:

> As they were walking I heard the policeman start to run as I could hear someone running through the water and then I heard six or seven shots fired and I then got out of the car and told the other two not to kill him. I looked out in the water where the policeman run and I could not see him.

In my judgment, these statements reveal such a fundamental conflict between the defenses of the petitioner and his nephew and co-defendant, that Millard Farmer could not possibly have provided adequate representation to both.

Since the prosecution knew that the petitioner was unrepresented at the hearing, it is of no consequence that the judge presiding at the hearing was not formally advised that the petitioner was not represented by Mr. Farmer. Indeed, in my view, the hearing judge was under an affirmative duty to inquire whether Mr. Farmer represented the petitioner once there were sufficient facts before him indicating the possibility of a conflict of interest between the defendants. *See Wood v. Georgia*, 450 U.S. 261, 272, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981). There is authority in this Circuit that the mere fact that the only witnesses to the murder were the defendants themselves was sufficient reason for the judge to inquire, in view of the substantial possibility that each would emphasize another's guilt to exonerate themselves. *See Foxworth*, 576 F.2d at 1077. In any event, once the prosecution introduced the statements of the three defendants, even a cursory reading of those statements would have revealed the existence of an actual and substantial conflict of interest.[5] At that time the judge would certainly have been under a duty to inquire. Such an inquiry would have revealed that the petitioner was not represented by counsel at the hearing.

Neither Mr. Farmer nor Mr. Parrish believed that Mr. Farmer was representing petitioner at the hearing. Consequently, none of the attorneys involved understood Mr. Farmer to be representing all three defendants. Since he was not, this is not a case of multiple representation. Instead, it is simply a case where two of three co-defendants were represented and the other was not.

Since the petitioner was not represented by counsel at the committal hearing, the question remains whether he knowingly and intelligently waived his right to counsel. *See Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). The right to counsel must be affirmatively waived, and the mere failure to

---

5. Apart from questions of conflict of interest, if, as Mr. Parrish and Mr. Farmer have testified, the petitioner in fact sat apart from his co-defendants and their counsel and clearly did not participate in any discussions with Mr. Farmer, while his co-defendants did, such circumstances would also have placed on the judge a duty to inquire whether Mr. Farmer in fact represented all three defendants.

request counsel will not be deemed a waiver. *Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977); *Carnley v. Cochran,* 369 U.S. 506, 513, 82 S.Ct. 884, 888, 8 L.Ed.2d 70 (1962); *Brown v. Wainwright,* 665 F.2d 607, 611 (5th Cir. 1982) (en banc). Thus, the petitioner's own failure to demand representation at the hearing was not a waiver of his right to counsel. Moreover, since Mr. Parrish served in no capacity other than as appointed counsel on the kidnapping charge, he had no authority to waive the petitioner's right to be represented at the committal hearing on the murder charge.

### (c) *The Appropriate Relief*

In *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), the Supreme Court held:

> [W]hen a defendant is deprived of the presence and assistance of his attorney, either throughout the prosecution or during a critical stage in, at least, the prosecution of a capital offense, reversal is automatic. *Gideon v. Wainwright,* 372 U.S. 335 [83 S.Ct. 792, 9 L.Ed.2d 799] (1963); *Hamilton v. Alabama,* 368 U.S. 52 [82 S.Ct. 157, 7 L.Ed.2d 114] (1961); *White v. Maryland,* 373 U.S. 59 [83 S.Ct. 1050, 10 L.Ed.2d 193] (1963).

*Holloway,* 435 U.S. at 489, 98 S.Ct. at 1181.

In my view, *Holloway* overrules *Coleman v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970), to the extent that *Coleman* applied a harmless error standard to this sort of violation of the right to counsel. *See Coleman,* 399 U.S. at 11, 90 S.Ct. at 2004. *Holloway* makes it clear that the deprivation of counsel at a critical stage in a prosecution where the death penalty is sought or imposed is so inherently unfair that prejudice is presumed and reversal of the conviction is automatic. It may be, as the Sixth Circuit has recently

concluded, that the harmless error standard utilized in *Coleman* is still applicable to denial of counsel claims where the conviction is for a non-capital offense. *See McKeldin v. Rose,* 631 F.2d 458, 460 (6th Cir.1980), *cert. denied* 450 U.S. 969, 101 S.Ct. 1488, 67 L.Ed.2d 619 (1981). However, under *Holloway,* the rule is otherwise when a capital conviction is involved.

Reversal is mandatory regardless of the stage at which counsel was denied and regardless of the form which the denial of counsel took. That this is so is clear from two of the cases on which the court relied for its holding in *Holloway.*[6] In *Hamilton v. Alabama,* 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961), the Supreme Court reversed a conviction where counsel had been absent at the arraignment, at which any available defenses, including insanity, had to be pleaded. The Court declined to inquire whether any defenses were actually available to the defendant, holding instead that prejudice was presumed. *Id.* at 55, 82 S.Ct. at 159.

In *White v. Maryland,* 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963), also cited in *Holloway,* the defendant pleaded guilty at a preliminary hearing, at which he was not represented by counsel. Although he subsequently changed his plea to not guilty and not guilty by reason of insanity at a subsequent arraignment, at which he was represented by an attorney, the Supreme Court concluded that the absence of counsel at the preliminary hearing required reversal, adding, "[W]e do not stop to determine whether prejudice resulted." *White,* 373 U.S. at 60, 83 S.Ct. at 1051.[7]

Since it is my belief that the petitioner was denied the right to counsel at a committal hearing which, under the circumstances, was a critical stage in his prosecution for murder, and since he did not waive

---

**6.** In *Holloway,* the Court reversed a conviction on the ground that the trial judge, over timely objection, had improperly required joint representation of several co-defendants whose interests were in conflict. The Court concluded that prejudice was to be presumed without the necessity of an actual showing. *Id.* 435 U.S. at 488–89, 98 S.Ct. at 1180–81.

**7.** The prosecution, without objection, introduced the original guilty plea as evidence against the defendant at his trial. Noting the defendant's failure to object, the Supreme Court concluded that it was not necessary to show prejudice. *Id.* at 60 n. *, 83 S.Ct. at 1051 n. *.

that right, reversal of his conviction is required. I would therefore reverse the judgment of the district court and direct the issuance of a writ of habeas corpus.