**Son H. FLEMING, Petitioner–Appellant,**

v.

**Ralph KEMP, Warden, Georgia Diagnostic and Classification Center, Respondent–Appellee.**

**No. 86–8476.**

United States Court of Appeals, Eleventh Circuit.

Jan. 27, 1988.

---

Kathryn O'Shields Shapiro, Powell, Goldstein, Frazer & Murphy, Kenneth A. Shapiro, Paul, Hastings, Janofsky & Walker, Atlanta, Ga., for petitioner-appellant.

Mary Beth Westmoreland, Asst. Atty. Gen., Atlanta, Ga., for respondent-appellee.

Before FAY, JOHNSON and CLARK, Circuit Judges.

PER CURIAM:

Son H. Fleming was scheduled for execution on June 27, 1986. On June 25, 1986, the United States District Court for the Middle District of Georgia dismissed Fleming's second federal habeas corpus petition on "abuse of the writ" grounds and thus refused to grant Fleming a stay of execution. *Fleming v. Kemp*, 637 F.Supp. 1547 (M.D.Ga.1986). On June 27, 1986, this panel stayed Fleming's execution because he presented at least one substantial ground properly before this Court upon which he might be entitled to relief. *Fleming v. Kemp*, 794 F.2d 1478 (11th Cir.1986). Without reaching the merits of Fleming's petition, this panel stayed Fleming's execution pending the Supreme Court's decision in *Griffith v. Kentucky*, — U.S. —, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). We now reach the merits and affirm the district court.

## I.

Fleming was convicted of murdering the police chief of a small South Georgia town and sentenced to death in 1977. On direct appeal, the Georgia Supreme Court reversed the death sentence because the trial judge erred in instructing the jury in the sentencing phase. *Fleming v. State*, 240 Ga. 142, 240 S.E.2d 37 (1977). In a second sentencing trial a jury again recommended the death penalty and the court sentenced Fleming accordingly.

After Fleming failed to win further relief on direct appeal, *see Fleming v. State*, 243 Ga. 120, 252 S.E.2d 609 (1979), *cert. denied*, 444 U.S. 885, 100 S.Ct. 177, 62 L.Ed.2d 115 (1979), and in state postconviction proceedings, he filed his first federal habeas corpus application with the United States District Court for the Middle District of Georgia. That court denied the writ, *Fleming v. Zant*, 560 F.Supp. 525 (M.D.Ga.1983), and on appeal a divided panel of this Court affirmed. *Fleming v. Kemp*, 748 F.2d 1435 (11th Cir.1984), *reh'g en banc denied*, 765 F.2d 1123 (11th Cir.1985). The Supreme Court denied certiorari, *Fleming v. Kemp*, 475 U.S. 1058, 106 S.Ct. 1286, 89 L.Ed.2d 593 (1986), and rehearing. *Fleming v. Kemp*, 475 U.S. 1132, 106 S.Ct. 1665, 90 L.Ed.2d 206 (1986).

The Superior Court of Butts County, Georgia, thereafter denied Fleming's second state habeas application, and the Georgia Supreme Court refused to grant a certificate of probable cause to appeal. Fleming then filed his second federal habeas petition, giving rise to the present case.

## II.

### A. *Michigan v. Jackson* Claim

Fleming argues that his Sixth and Fourteenth Amendment rights were violated when at his resentencing the prosecutor presented statements obtained in police interrogation after Fleming was formally charged and had requested the assistance of counsel. Fleming argues that *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), applies retroactively and thus provides "new law" precluding an abuse of the writ finding. On the merits, Fleming argues he has established a *Jackson* violation. The district court held that even if *Jackson* represented a change in law, Fleming had not shown a *Jackson* violation. 637 F.Supp. at 1553. We affirm the district court.

### 1. *Abuse of the Writ?*

Fleming raised this claim in his first federal habeas petition before the district court, but did not pursue the claim on appeal. In staying Fleming's execution, this panel determined that these facts mean that this petition is a successive petition. *Fleming,* 794 F.2d at 1482–83. This panel also set forth the test for determining whether abuse of the writ is present and whether the "ends of justice" excuse that abuse:

> If the ground was previously addressed in a federal habeas proceeding, the petitioner must demonstrate that the decision was not on the merits or the ends of justice would be served by reconsideration of the merits. The "ends of justice" are defined by objective factors, such as whether there was a full and fair hearing on the original petition or whether there was an intervening change in the facts of the case or the applicable law.

*Id.* at 1481–82 (quoting *Witt v. Wainwright,* 755 F.2d 1396, 1397 (11th Cir. 1985)).

No doubt exists that this ground was raised in a previous proceeding and that the decision was on the merits. Thus, abuse is excused only if the "ends of justice" so require.[1] No doubt exists that as to this claim there was a full and fair hearing on the original petition and that no intervening change in the facts of the case has occurred.

Fleming argues, however, that the Supreme Court decision in *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), presents an "intervening change in the applicable law," thus excusing any abuse of the writ problems.

This Court must determine (a) if *Jackson* did indeed "change the law" and (b) if so, whether *Jackson* applies retroactively to Fleming's case.

### a. *Intervening Change in Law?*

■ In *Jackson,* the Supreme Court held that, "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." 106 S.Ct. at 1411. This holding represented a recognition that the decision in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), which was based on the Fifth Amendment, applied with even "greater force" to Sixth Amendment claims. *Jackson,* 106 S.Ct. at 1411. *Jackson* thus provides a "bright-line" rule that differs from prior Sixth Amendment cases which focused on whether defendants validly waived their right to counsel. *Id.* at 1408. This suffices to constitute an intervening change in the law.[2]

### b. *Jackson's Retroactivity*

Having established that *Jackson* represents an intervening change in the law, the question arises whether *Jackson* applies retroactively to Fleming's case—a case of collateral attack. Supreme Court decisions concerning retroactivity exhibit a dichotomy depending upon whether the case is final (i.e., under collateral attack) or pending on direct review. Last Term, the Court provided a "bright-line" rule that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on *direct review or not yet final,* with no exception

---

1. A four-Justice plurality has suggested that the "ends of justice" will demand consideration of the merits of claims only where there is "a colorable showing of factual innocence." *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 2627, 91 L.Ed.2d 364 (1986). In *Moore v. Kemp,* 824 F.2d 847, 856 (11th Cir.1987) (en banc), this Court did "not decide at this time whether a colorable showing of factual innocence is a necessary condition for the application of the ends of justice exception." Thus, the standard quoted in the text as set forth in this panel's prior opinion is applied.

2. In addition, on November 29, 1984, this Court affirmed the district court's denial of Fleming's first habeas petition. *Fleming,* 748 F.2d 1435 (11th Cir.1984). On March 15, 1984, this Court had expressly refused to extend *Edwards* to Sixth Amendment claims. *Collins v. Francis,* 728 F.2d 1322, 1331–34 (11th Cir.1984), *reh'g en banc denied,* 734 F.2d 1481 (11th Cir.1984), *cert. denied,* 469 U.S. 963, 105 S.Ct. 361, 83 L.Ed.2d 297 (1984). Thus, Fleming could not have succeeded on this claim in his first petition.

for cases in which the new rule constitutes a 'clear break' with the past." *Griffith v. Kentucky,* — U.S. ——, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987) (emphasis added). Because Fleming's case is final, *Griffith* provides no support.

The Supreme Court has continued to apply a three-prong test in determining whether new constitutional rules governing criminal prosecutions should apply retroactively for cases on collateral review: (1) the purpose to be served by the new standards, (2) the extent of the reliance by law enforcement authorities on the old standards, and (3) the effect on the administration of justice of a retroactive application of the new standards.[3]

■ In *Solem v. Stumes,* 465 U.S. 638, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984), the Court applied the three-prong test and held that *Edwards* does not apply retroactively to cases on collateral review.[4] Although *Jackson* is an extension of *Edwards* into the Sixth Amendment context, *Stumes* does not *a fortiori* require a holding of nonretroactivity for *Jackson.*[5]

### i. Purpose Served by the New Standard

In *Stumes,* the Court recognized that it has consistently held retroactive new rules

going to the "heart of the truthfinding function." 465 U.S. at 645, 104 S.Ct. at 1343. The *Stumes* Court noted that although *Edwards* was not entirely unrelated to the accuracy of the final result, *Edwards* only set forth a prophylactic rule designed to implement preexisting rights, a type of rule usually not applied retroactively. *Id.* at 644–45, 104 S.Ct. at 1342. *Jackson* has similar purposes; it creates a prophylactic rule designed to implement preexisting rights. Consequently, under this prong, retroactivity appears disfavored.

### ii. Prior Law Enforcement Reliance

In *Stumes,* the Court found *Edwards* not to have been "clearly" or "distinctly" foreshadowed, even though it was not a "clear break" with the past. The Court thus found the reliance interest of law enforcement officials compelling. *Id.* at 649–50, 104 S.Ct. at 1344–45. Similarly, *Jackson* did not represent a "clear break." *Jackson,* however, was clearly foreshadowed by *Edwards,* especially because *Edwards* heavily relied on Sixth Amendment precedent. Thus the reliance interest is considerably less with *Jackson* and retroactivity seems favored.[6]

---

**3.** The Court most recently applied this test in *Allen v. Hardy,* 478 U.S. 255, 106 S.Ct. 2878, 2880, 92 L.Ed.2d 199 (1986) (*Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), not retroactive to cases on collateral review).

The Supreme Court recently declined to hold that a newly-announced constitutional rule generally should not be applied retroactively to cases pending on collateral review. *Yates v. Aiken,* — U.S. ——, 108 S.Ct. 534–35, 98 L.Ed. 2d 546 (1988). The Court held that *Aiken* did not concern a newly- announced constitutional rule, but rather involved a mere application of principles that were well settled at the time of conviction. *Id.* 108 S.Ct. at 535–37.

Chief Justice Rehnquist has stated that he generally would support nonretroactivity for cases on collateral review. *Griffith,* 107 S.Ct. at 717 (Rehnquist, C.J., dissenting); *see also id.* at 716 (Powell, J., concurring) and opinions cited therein; *Mackey v. United States,* 401 U.S. 667, 675, 91 S.Ct. 1160, 1164, 28 L.Ed.2d 404 (1971) (Harlan, J., concurring in two cases and dissenting in another).

**4.** *Edwards* does apply retroactively to cases on direct review or not yet final. *Shea v. Louisiana,* 470 U.S. 51, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985).

**5.** *Jackson's* retroactivity for cases on collateral review is a question of first impression in this Circuit. Apparently only one court in the nation has addressed the issue. In *Collins v. Kemp,* 792 F.2d 987 (11th Cir.1986), this Court stayed Collins' execution pending a determination of whether *Jackson* applies retroactively. The Court noted "that the district court in this case is the only federal court that has considered the retroactivity of *Jackson....*" *Id.* at 989. The district court, in an unpublished opinion, relied on *Stumes* and held that *Jackson* was not retroactive. *See id.* at 988.

**6.** In *Stumes,* however, the Court examined the reliance factor without referencing the law at the time of Stumes's underlying arrest in 1973. Rather, the Court examined case law up to the point of its decision in *Edwards* in 1981. Thus, *Edwards* certainly foreshadowed *Jackson,* but at the time of Fleming's case in 1976–77, *Edwards* did not exist.

### iii. *Administrative Effect*

In *Stumes*, the Court asserted that "a disruptive effect on the administration of justice ... [w]e can only guess at" counseled against retroactivity. *Id.* at 650, 104 S.Ct. at 1345. Given that *Jackson* was foreshadowed and given that police officials are aware of how difficult it is to introduce statements once a defendant has asserted his right to counsel before a judicial officer, few cases likely will raise this issue. *Cf. Jackson*, 106 S.Ct. at 1413 (Rehnquist, J., dissenting) ("The Court does not even suggest that the police commonly deny defendants their Sixth Amendment right to counsel. Nor, I suspect, would such a claim likely be borne out by empirical evidence."). Consequently, this limited "disruptive effect" supports holding *Jackson* retroactive.

Whether to apply *Jackson* retroactively inevitably involves a balancing process. In light of the "presumption of retroactivity," *Stumes*, 465 U.S. at 642, 104 S.Ct. at 1341, this Court could hold that *Jackson* applies retroactively to *all* cases. Such a broad holding, however, is unnecessary. Rather, the conclusion here is tailored to the facts peculiar to Fleming's petition.[7] Fleming made four statements to police officials: (1) a February 12, 1976 oral statement to Detective Register and Sheriff Gaskins; (2) a February 15 tape-recorded statement to Agent Greeson; (3) a February 16 tape-recorded statement to Detective Register and Sheriff Gaskins; and (4) a subsequent February 16 oral, unrecorded statement to Sheriff Alderman. Only the second and third statements are at issue. Fleming gave the February 12 statement before he had allegedly asserted his right to counsel at an adverse judicial proceeding. Fleming, rather than the police, initiated the interrogation leading to the fourth statement. *See Tucker v. Kemp*, 818 F.2d 749,

751 (11th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 2209, 95 L.Ed.2d 863 (1987).

The State elicited testimony about the second and third statements only at Fleming's new sentencing trial on December 5–6, 1977, and not at the guilt phase in January 1977. Consequently, Fleming's petition presents the narrow question of whether *Jackson* should apply retroactively where the statements subject to a *Jackson* challenge were before the jury at the sentencing phase only.

### iv. *Purpose Served by the New Standard*

*Jackson* establishes a prophylactic rule designed to protect a defendant's right to counsel. When a defendant invokes his right to counsel, this invocation is tantamount to his admission "that he does not believe that he is sufficiently capable of dealing with his adversaries singlehandedly." *State v. Jackson*, 421 Mich. 39, 63–64, 365 N.W.2d 56, 67 (1984), *quoted with approval in Jackson*, 106 S.Ct. at 1410 n. 7.

*Jackson* thus sets forth a "bright-line" rule when statements must be suppressed. As *Stumes* noted, the Court does not favor retroactivity for prophylactic rules. The facts peculiar to Fleming's petition, however, support holding *Jackson* retroactive.[8] The Supreme Court favors retroactivity for decisions going to the "truth-seeking" function of the jury. In capital cases, determining whether a defendant receives a life sentence or a death sentence is akin to the jury's truth-seeking role during the guilt phase.

The Supreme Court has drawn a distinction between capital and noncapital cases in sentencing determinations. In *Turner v. Murray*, 476 U.S. 1, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986), the Court held that a black defendant accused of committing a capital crime against a white victim is con-

---

**7.** Examining the facts peculiar to Fleming's petition is *not* an examination of the merits of Fleming's *Jackson* claim. The question of retroactivity is distinct from an examination of the merits. *See Stumes*, 465 U.S. at 655, 104 S.Ct. at 1348 (Stevens, J., dissenting) (although case involves clear *Edwards* violation, Court holds *Edwards* nonretroactive).

**8.** Because the statements at issue were not introduced during the guilt phase, Fleming's petition only implicates the jury's determination of whether a life sentence or a death sentence is the appropriate punishment.

stitutionally entitled to have veniremen examined as to racial bias. In so holding, the Court refused to extend *Ristaino v. Ross*, 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976), to capital cases. *Ristaino* held that an examination of veniremen regarding racial bias is not constitutionally required when such questioning is requested by a defendant accused of a *noncapital* interracial violent crime.

In *Turner*, the Court remanded for a new sentencing determination. A four-Justice plurality[9] stressed the unique role played by the jury at the sentencing phase in a capital case, and stressed the qualitative difference between death and other forms of punishment. Similar policies are implicated by Fleming's case. Consequently, this "purpose" factor counsels that *Jackson* should apply retroactively to sentencing determinations in capital cases.

Such a conclusion would comport with holdings giving retroactive effect to cases affecting the evidence available to juries when they make death sentence determinations. For example, *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), applies retroactively. *See Songer v. Wainwright*, 769 F.2d 1488, 1489 (11th Cir. 1985) (en banc), *cert. denied*, — U.S. —, 107 S.Ct. 1982, 95 L.Ed.2d 822 (1987). *See also Adams v. Dugger*, 816 F.2d 1493 (11th Cir.1987) (applying *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) retroactively), *cert. filed* (July 20, 1987).

#### v. *Prior Law Enforcement Reliance*

The facts of Fleming's petition do not favor retroactivity on this point. The statement at issue here was taken in February 1976. At that point, the Supreme Court had clearly articulated that "it has been firmly established that a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him." *Kirby v. Illinois*, 406 U.S. 682, 688, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411 (1972) (plurality opinion) (citing nine Supreme Court precedents).[10] The Court defined a "formal charge, preliminary hearing, indictment, information, or arraignment" as forms of "adversary judicial proceedings." *Id.* at 689, 92 S.Ct. at 1882. Likewise, at the time of Fleming's arrest in 1976, it was also clear that statements taken in violation of a person's Sixth Amendment rights could not be used against that person at trial. *See Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

But at the time of Fleming's resentencing in December 1977, the Supreme Court had recently indicated that even if the Sixth Amendment right to counsel had attached, a person could waive it. *See Brewer v. Williams*, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977) ("[I]t was incumbent upon the State to prove 'an intentional relinquishment or abandonment of a known right or privilege.'" (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938))). Indeed, the *Williams* Court observed, "The Court of Appeals did not hold, nor do we, that under the circumstances of this case Williams *could not*, without notice to counsel, have waived his rights under the Sixth and Fourteenth Amendments. It only held, as do we, that he did not." 430 U.S. at 405–06, 97 S.Ct. at 1243 (footnote omitted) (emphasis in original). Thus, the *Williams* Court declined the chance to fashion the prophylactic rule ultimately adopted in *Jackson.*

#### vi. *Administrative Effect*

As noted when examining *Jackson*'s retroactivity to all cases, the "disruptive effect" was small. Limiting *Jackson*'s retroactivity to the sentencing phase of capi-

---

**9.** A majority of the Court certainly shared this view. Justices Brennan and Marshall disagreed with the plurality because they would have reversed the conviction as well.

**10.** That *Kirby* was a plurality opinion does not undercut this statement. The Court's disagreement in *Kirby* focused on whether the right to counsel attached *before* the initiation of adversary judicial criminal proceedings. As noted in the text *infra*, Fleming's case concerns the right to counsel attaching *after* the initiation of such proceedings.

tal cases lessens this effect even more. In addition, the *Stumes* Court worried "[t]hat investigation, and the possible retrial, would be hampered by problems of lost evidence, faulty memory, and missing witnesses." 465 U.S. at 650, 104 S.Ct. at 1345. Such concern is lessened here because Fleming's petition seeks only a new sentencing determination. Consequently, retroactivity is favored.

■ In conclusion, whether to apply *Jackson* retroactively to the facts in Fleming's petition involves a balancing process. The qualitative difference between death and other forms of punishment, the unique role played by juries in death sentence determinations, the importance of protecting the Sixth Amendment right to counsel, and the limited disruptive effect on the administration of justice caused by retroactivity favor holding *Jackson* retroactive. Reliance by law enforcement officials suggests otherwise. The reliance effect, however, should not play that large a role because the Sixth Amendment aims mainly to protect an individual's right to counsel; it does not, unlike the Fourth Amendment, aim mainly to deter police misconduct. Consequently, *Jackson* applies retroactively to the facts of Fleming's petition. *Jackson* thus provides an intervening change in law and applies retroactively to excuse Fleming's abuse of the writ.

### 2. *The Merits of the Jackson Claim*

Fleming was arrested in the early morning hours of February 12, 1976. That day, he appeared before a Justice of the Peace, who, according to the prosecutor, advised Fleming of the three charges (robbery, kidnapping, and murder) that had been lodged against him, of his right to counsel, of his right to a committal hearing, and of other rights to which he was entitled. The Justice of the Peace set no bond. Fleming advised the Justice of the Peace that he would get his own attorney rather than

have the state appoint one for him. On February 15 and 16, the police initiated interrogation and obtained the statements at issue here.[11]

As noted above, the Supreme Court held in *Jackson* that, "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." 106 S.Ct. at 1411. In the present case, Kemp argues that: (1) Fleming did not assert his right to counsel, and (2) even if Fleming did assert his right to counsel, he did not assert it at an "arraignment or similar proceeding."

#### a. *Asserting the Right*

■ In *Jackson*, the defendants at their arraignment had asked for counsel to be appointed for them. Kemp argues that because Fleming only said he was going to get his own attorney, Fleming did not "assert" his right to counsel.

This argument is without merit. In *Jackson*, the Court noted that courts should "give a broad, rather than a narrow, interpretation to a defendant's request for counsel—[courts should] presume that the defendant requests the lawyer's services at every critical stage of the prosecution." 106 S.Ct. at 1409. Fleming's invocation certainly fits within this broad interpretation, especially because invoking the right to counsel indicates that the defendant recognizes that he cannot deal with his adversaries singlehandedly.[12]

#### b. *Type of Proceeding*

■ Kemp argues that nothing in the record indicates that Fleming made any appearance before a judicial officer on February 12 except for the statement of the investigating detective who attended the proceeding. He then argues that even if a proceeding occurred, it was not a formal

---

**11.** One of the men present at the February 12 hearing was present at the February 16 questioning.

**12.** In addition, the Court intimated that the right to counsel can attach even if the defendant

does not make such an assertion. 106 S.Ct. at 1409 n. 6. Because Fleming asserted his right to counsel, however, there is no need to resolve whether the right attaches absent an assertion.

arraignment and thus falls outside of *Jackson*'s holding.

These arguments are also without merit. First, the detective's testimony clearly establishes that Fleming appeared before a judicial officer on February 12. (Indeed, the detective even termed the proceeding an arraignment.) Second, although Kemp is correct that formal arraignment had not occurred, *Jackson*'s holding is not so limited. The *Jackson* Court focused on a time "after a formal accusation has been made —and a person who had previously been just a 'suspect' has become an 'accused' within the meaning of the Sixth Amendment." 106 S.Ct. at 1409. Fleming's hearing fits within *Kirby*'s definition of an adverse judicial proceeding—Fleming certainly had been formally charged by the time he asserted his right to counsel before a judicial officer. Consequently, a *Jackson* violation occurred under the facts of Fleming's petition.

### 3. *Harmless Error*

■ Although a *Michigan v. Jackson* violation occurred, we examine whether admitting evidence attributable to that violation was harmless error. In the guilt/innocence context, the harmless error standard is whether, absent the unconstitutional conduct, it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty. *United States v. Hasting*, 461 U.S. 499, 510–11, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96 (1983). This standard applies to the sentencing context as well: Absent the testimony concerning the statements obtained in violation of *Jackson*, is it clear beyond a reasonable doubt that the jury would have returned a sentence of death? Although we hesitate to hold that the jury would have determined a death sentence absent the two statements at is-

sue, our review of the record nonetheless leads us to that conclusion. Accordingly, we affirm the district court as to Fleming's *Michigan v. Jackson* claim.

We note from the outset that the statements at issue were introduced only at the penalty phase and were not introduced during the guilt phase. In addition, we note that at the resentencing on December 5–6, 1977, Fleming had already been convicted for the murder of James Edward Giddens, the police chief of Ray City, and that the sentencing jury started from the guilt phase jury's conclusion. At the end of the resentencing, the jury unanimously made the following determination:

> JURY FOREMAN: We find the following aggravating circumstances, Number one, the offense of murder was committed against Police Chief James Edward Giddens, a peace officer while he was engaged in the performance of his duties. We also found Number two, the offense of murder was committed while the Defendant was engaged in the commission of another capital felony, to-wit: the kidnapping in Berrien County, Georgia and bodily injury to James Edward Giddens a human being. We recommend that the Defendant be punished by death this 6th day of December, 1977....

(Respondent's Exhibit Number One, Volume III: 493–94).[13]

■ We have undertaken a careful review of Fleming's resentencing transcript and conclude that even if the statements at issue were excluded, the jury still would have found the two aggravating circumstances quoted above. First, the statements at issue had no bearing on the aggravating circumstance of whether Giddens was murdered while he was a peace officer engaging in the performance of his duties,[14] and even if the statements at issue

---

**13.** The entire transcript of Fleming's December 1977 resentencing is contained in Volumes I–III as an exhibit to Fleming's first state habeas corpus petition hearing on March 27, 1980, before Judge Paul Caswell of the Superior Court of Tattnall County, Georgia.

**14.** As an appendix to this opinion, we have set forth the testimony given by police officials at

Fleming's resentencing concerning all four statements.

At oral argument, Fleming's counsel noted that the prior panel described Fleming's February 16 statement to Detective Register and Sheriff Gaskins as follows: "[Fleming's tape-recorded February 16 statement to Detective Register and Sheriff Gaskins] was most damaging to petitioner because it contained so many incon-

had bearing on the second aggravating circumstance, testimony by Ira Bass was most damaging on this point (as well as on Fleming's conviction for murder). Because Bass was unavailable to testify at the resentencing (although his probation required that he inform the State of his whereabouts), the State read Bass's testimony from the guilt phase into evidence at the resentencing.[15] Bass testified on direct examination as follows:

A   Yeah, he [Son Fleming] said that he was driving—that he was the only one that had a—any license.

Q   He told you that? He told you that he was the only one that had any license?

A   Yes, sir and he said that they ain't nobody knew that he was in the car. Said nobody couldn't identify him. And he said they left there and headed out towards Ray City and the police stopped him over there. He got out to talk to the policeman. There were houses around there and he said he got out to talk to the policeman and the policeman laid the license on the car to do something or other. I don't know what he was going to do. But anyway one of the others had jumped him and the policeman tried to get his gun out and they all got—they all three got on to him then. They were all three fighting for the gun—or you know, trying to take the gun away from him. And they finally got it away and got him in the car. They started to leave there

and Son had forgot his license and he went back after his license. He drove on out. He said he wasn't sure just where he was going but they rode around some of these roads out there and come down this country lane or country road. And said they stopped and got out of the car and they had a little scuffle there. And he took the gun from Larry—the .38 and said when the police officer started to run he shot him. Said then by then the officer was in the water.

(Vol. II: 284). We are left with the impression that Bass's testimony, rather than Fleming's statements at issue here, was critical to the jury's determination.[16]

Second, as set forth in the appendix, the substance of the challenged February 15 statement as testified to by Agent Greeson is identical to the substance of the unchallenged February 12 statement as testified to by Detective Register and Sheriff Gaskins. As also set forth in the appendix, the substance of the challenged February 16 statement as testified to on direct and cross examination by Detective Register and Sheriff Gaskins is identical to the substance of the unchallenged February 16 statement as testified to by Sheriff Alderman. Consequently, our review of the record convinces us that the use of Fleming's statements during his resentencing constituted harmless error.

---

sistencies and vacillations that it appeared to be unbelievable." *Fleming,* 748 F.2d at 1449. In addition, at oral argument, Fleming's counsel claimed that the statements at issue were introduced into evidence at the resentencing. As the testimony in the appendix to this opinion makes clear, however, the resentencing jury had only summaries of the statements before it. None of Fleming's statements transcribed verbatim was introduced into evidence at the resentencing.

We further note that Fleming testified at his resentencing that police officials obtained the statements only after they beat him, even though he had never mentioned this before. We also note that defense counsel, during closing argument, admitted that he did not believe Fleming's testimony alleging beatings.

15.   Defense counsel vigorously pointed out to the jury that Bass received probation on a child molestation conviction after testifying at Fleming's trial.

16.   Indeed, Fleming's defense counsel recognized this in his closing argument to the resentencing jury:

Now that is a man [Ira Bass] upon whose word you must entirely rely to give a conscientious death sentence in this case. There is no other source of information that would show Son Fleming so guilty of a crime and of such a nature that you had to put him to death. *The policemen's statements don't show that. They show he begged for the life of the deceased.* Just Ira Bass, convicted twice of child molestation, convicted of burglary, convicted of the simple larceny of a bicycle and convicted of aggravated assault besides he said—several minor things. You're asked *solely on his testimony—on none other to* take the life of a human being. That's the proposition that's before you.

(Vol. III:  475) (emphasis added).

## B. *No Assistance of Counsel*

■ Fleming contends that his Sixth and Fourteenth Amendment rights were violated because he lacked assistance of counsel at his committal hearing. We affirm the district court because this claim fails as an abuse of the writ and because the prior panel of this Court did not commit "plain error" in rejecting this claim.

No doubt exists that this ground was raised in Fleming's first petition and that the decision was on the merits. Thus, abuse is excused only if the "ends of justice" so require.[17] No doubt exists that there was a full and fair hearing on the original petition and that no intervening change in the applicable law has occurred.

Fleming argues, however, that an affidavit from the probate judge presiding over Fleming's hearing is "new evidence" (i.e., "an intervening change in the facts of the case").[18] This claim is without merit. No *intervening* change occurred; the evidence was available at the time of the first petition and Fleming should have presented it then. *See Adams v. Wainwright*, 804 F.2d 1526, 1534 n. 10 (11th Cir.1986) (new reports are not evidence justifying reconsideration of claim because, *inter alia*, they are drawn from information available at time of first petition), *cert. filed* (July 20, 1987); *Young v. Kemp*, 758 F.2d 514, 519 (11th Cir.1985) (adopting district court conclusion that "new" evidence concerned facts available before first petition filed); *Henry v. Wainwright*, 743 F.2d 761, 762 (11th Cir.1984) (abuse of writ where facts underlying claim were known or reasonably should have been known to defendant and his counsel years ago); *Smith v. Kemp*, 715 F.2d 1459, 1469 (11th Cir.) (abuse of writ precludes consideration of merits when claim is based on additional

conclusions drawn from same records available to petitioner when same claim was made to and adjudicated by previous courts), *cert. denied*, 464 U.S. 1003, 104 S.Ct. 510, 78 L.Ed.2d 699 (1983).

■ An exception does exist if a petitioner proffers a justifiable reason for delay in presenting the evidence. *See, e.g., Henry*, 743 F.2d at 762. Fleming claims that the affidavit was not provided to the district court because no issue existed as to whether Fleming had assistance until the district court determined that he had. Even if this is true, Fleming never sought to supplement the record on appeal or present the affidavit to the district court in a motion for reconsideration.

■ Fleming also contends that this panel can reexamine the prior decision because it was in "plain error." *See Bass v. Wainwright*, 675 F.2d 1204 (11th Cir.1982). The issue received full consideration before the prior panel, especially because Judge Tuttle's dissent highlighted the opposing view. *See Fleming*, 748 F.2d at 1442–45. Rehearing en banc at the suggestion of a member of this Court was denied. 765 F.2d 1123 (11th Cir.1985). Finally, the Supreme Court, with Justice Marshall arguing that Fleming lacked assistance of counsel, denied certiorari. 475 U.S. 1058, 106 S.Ct. 1286, 89 L.Ed.2d 593 (1986). The Supreme Court then denied Fleming's petition for rehearing. 475 U.S. 1132, 106 S.Ct. 1665, 90 L.Ed.2d 206 (1986). In light of the extensive consideration that this issue has already received without a change in result from the original panel opinion, we cannot say the first panel committed "plain error."[19]

Accordingly, AFFIRMED.

---

**17.** *See supra* note 1.

**18.** In this affidavit, the presiding probate judge swears that he did not believe Fleming was assisted by counsel at the hearing. This affidavit, although not part of the original record on appeal before the panel that rendered its opinion regarding Fleming's first petition, was presented as an appendix to Fleming's brief in his petition for rehearing en banc. There is no need to determine whether this is "new evidence" in the sense that this Court has never

passed on it before. The fact that the evidence was available so near the time of the first petition only buttresses the conclusion that the evidence was available at the time of the first petition.

**19.** In his second petition, Fleming also claimed that his conviction and death sentence violated the protections of the Sixth and Fourteenth Amendments as set forth in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). After this Court ordered full briefing

## APPENDIX

MR. BILLY REGISTER, called as a witness in behalf of the State, after first being duly sworn, testified as follows:

### DIRECT EXAMINATION BY MR. BARNICK:

Q  State your name, please.

A  Billy E. Register.

Q  Mr. Register, what is your employment?

A  Detective Captain with the Valdosta Police Department.

. . . .

Q  All right, now what was your—you indicated that you interviewed the suspects. What were the circumstances of that interview and where was it held?

A  The interview was held in the Sheriff's Office in the Berrien County Courthouse. It was the morning of the 12th, the morning following the incident.

Q  All right now, do you recall who was present during the interview?

A  Sheriff Gaskins was present. There were several other people in and out of the office during the interview, sir.

Q  He was the only participant in the interview—is that what you're saying?

A  That's correct, sir.

. . . .

Q  All right, would you please tell us the substance of that interview with Son Fleming?

A  The interview that happened that morning, sir—the story that Mr. Fleming told me was that he was in Valdosta when this incident occurred, at the home of King West, or with a gentleman named King West who lives in Valdosta.

Q  What else did he indicate about knowledge of the events of the night of February 11th?

A  At that particular morning, sir referring to the morning of February 12, he had no knowledge of what happened—that he indicated to me.

. . . .

Q  All right. Did you have any other occasion to interview Son Fleming?

A  Yes, I did, sir.

Q  And, what was the date?

A  I don't recall the date, sir, it was on the following Monday after the 12th. I believe it was the 16th, I'm not sure.

Q  Somewhere around the 16th, of February?

A  Yes, sir.

Q  All right, now where was that interview held?

A  Again, at the courthouse in Berrien County, sir.

Q  And, who was present during that interview?

A  Sheriff Gaskins and myself and Deputy Swanson, sir.

following the *Griffith* decision, Fleming did brief this claim, but did not pursue it at oral argument. Fleming is not entitled to relief on Fourteenth Amendment grounds. *See Lindsey v. Smith*, 820 F.2d 1137, 1145 (11th Cir.1987), *cert. filed* (Oct. 3, 1987); *High v. Kemp*, 819 F.2d 988, 992 (11th Cir.1987), *cert. filed* (Oct. 9, 1987). Nor is Fleming entitled to relief on Sixth Amendment grounds. First, *Batson* provides no "new law" for relief. *See Batson*, 106 S.Ct. at 1716 n. 4 ("[We] express no view on the merits of any of petitioner's Sixth Amendment arguments."). Second, a documented history of the prosecutor's preemptory challenges provides no "new ground" for relief. *See Willis v. Zant*, 720 F.2d 1212, 1219 n. 14 (11th Cir.1983), *cert. denied*, 467 U.S. 1256, 104 S.Ct. 3548, 82 L.Ed.2d 851 (1984); *United States v. Dennis*, 804 F.2d 1208, 1209 n. 21 (11th Cir.1986) (constrained by *Willis* from granting relief on Sixth Amendment

grounds), *cert. denied*, —— U.S. ——, —— 107 S.Ct. 1973, 1974, 95 L.Ed.2d 814 (1987). Third, the Supreme Court and this Circuit have declined to extend the fair cross-section requirement to petit juries. *See Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 1764–65, 90 L.Ed. 2d 137 (1986); *Lindsey v. Smith*, 820 F.2d 1137, 1145 (11th Cir.1987), *cert. filed* (Oct. 3, 1987).

In his second petition, Fleming also claimed that prosecutorial remarks made in closing argument at trial required reversal pursuant to *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), and that his death sentence was unconstitutional because Georgia's sentencing process is arbitrary and discriminatory. After this Court ordered full briefing following the *Griffith* decision, Fleming did not brief these claims. We consider them abandoned.

. . . .

Q  All right now, to the interview itself, what did Son Fleming tell you?

A  I reduced the general gist to a typed statement.  Would you like me to read that?

Q  Well, yes, I think it will be alright for you to read it.

A  The statement says that on Wednesday, February 11, 1976, around 8:30 p.m., "I Son Fleming along with my nephew Larry and another boy whom I don't know left Moultrie in a car I had borrowed from a boy named Terry.  We drove to Valdosta and then to Adele.  We stopped in Adele and Larry and this other put me out of the car at a car lot on the main street and they drove off.  A few minutes later they came back and picked me up and we left Adele.  And they asked me where I wanted to go and I said let's go to Waycross, Georgia.  That a man over there owed me some money for a pulpwood truck that I had sold him.  We drove to Ray City and as we got to Ray City the policeman stopped our car.  And I got out and walked back to the front of the police car and gave the policeman my driver's license.  And he asked me if he could look in my car and I told him yes.  He then got the other two boys out of the car and searched them.  Then he looked in the car and he came back to the police car and told the boy I don't know to get in the police car and the policeman grabbed the boy by the arm and started to put him in the police car and then Larry grabbed him and they tussled around the car and then Larry and the other boy put the policeman in our car.  The boy I don't know then went to the police car and turned off the blue lights and the headlights and he took the shotgun out of the police car.  I drove the car and the policeman was in the middle of the front seat and the boy I don't know was sitting on the right side in the front and Larry was sitting in the back seat.  And we started off, we drove for a good piece and then the police told us he would show us how to get out of there and he told us to turn here and I turned to the right and the boy I don't know hit the policeman after he told us just to leave him side the road and he would take care of everything since this was his last night as a policeman.  We stopped the car and Larry and the other boy told the policeman to get out and Larry had the policeman's gun and the other boy had a .22 pistol.  The policeman got out of the car and started running out into a pond and Larry and the other boy were shooting at him and the policeman hollered that he was hit.  Larry and the other boy then said we can't leave him like this and they waded out in the pond and I heard some more shots.  It sounded like they came from a .22 pistol.  Both boys then came back to the car and we left and drove to Valdosta and we stopped at my uncle's house and I asked him if he had any clothes that Larry could put on because he had fell in a creek and he got wet trying to get water for the car that had run hot on us.  We left Valdosta and started back to Moultrie but we got stopped by the police in Morven."

. . . .

## CROSS EXAMINATION BY MR. PARRISH:

Q  Mr. Register, what additional thing in that statement, didn't you testify orally the other time that he said that he asked them not to harm the man?

A  He asked them not to harm the man?

Q  Yes.

A  I believe that did come up in the conversation with him during this statement.

Q  He told you that he asked them not to harm the policeman?

A  Yes, sir.

Q  And you just left that out of that statement inadvertently?

A  Well there are several things that he told me that's not in this typed portion of the statement that was in the transcribed portion.

Q  Is there anything else that you think of that would be helpful to Son that is in the—where you took it down, the transcript of the recorded part that's not in there?

A  Well, sir I think you'd probably be a better judge of what would be helpful for

him than I am, sir. I believe you have the transcript.

Q Well can you think of anything that's important—helpful or not helpful that is in that that's not in this?

A Well, the best I can recall, sir, he had asked the other boys not to hurt the policeman and I believe conversation ensued again between him and the other Defendants that they had to get rid of him. I believe that was the—

Q But he did tell you that he asked them not to harm him?

A I believe that's correct, yes, sir.

Q And you would have put that in if you'd have thought about it?

A If I'd have though (sic) about it?

Q In that statement that you were writing if that had crossed your mind you would have put it in—you wouldn't have left it out just to be unfair to him would you?

A No, sir I wasn't trying to be unfair to him I was—

Q So it was just inadvertence that that's not included in the written statement?

A I'm not a stenographer, Mr. Parrish.

Q Well, a stenographer couldn't listen and then write everything.

A This statement is not verbatim, no, sir.

Q You do remember that in getting a statement from him as you were questioning him that when he gave you a statement that in your thoughts was not true, you would tell him now that's not true—tell me the truth or words to that effect.

A I believe I asked him several times for the truth, the whole truth and nothing but the truth, sir.

Q Yes, and each time he gave you something that you didn't want and—maybe you didn't want it because you didn't think it was the truth. I'm not trying to impune (sic) your motives. You would tell him now that's not true, tell me what's true and he would keep telling you something else till he told what you thought was true.

A At each time during the interview that he would tell me something that at that time we had information or other things to show that was not the truth I would tell him to tell us the truth the whole truth and nothing but the truth, sir.

Q And then you keep fishing and doing that till he told you what you thought was the truth and what you wanted wouldn't you?

A No, sir. To be absolutely honest with you Mr. Parrish, I don't think that's the truth.

Q And—I believe on the other examination you said—We have no further questions.

(Vol. II: 222–25, 227–28, 251–56).

. . . .

SHERIFF D.H. ALDERMAN, called as a witness in behalf of the State, having been duly sworn, testified as follows:

Q State your name, please.

A D.H. Alderman, Jr.

Q Mr. Alderman, what is your occupation?

A Sheriff of Colquit County.

. . . .

Q All right, I'll ask you to recall the 16th day of February 1976 and ask you whether or not you participated in any way on that day.

A On the 16th of February?

Q 16th of February.

A I believe that date is correct.

Q What was the nature of your involvement?

A Well, I received a call, I believe from GBI Agent Greeson, I believe is the one that called us and said we needed to come over there to Nashville. Said you come too cause Son wants to talk to you.

. . . .

Q All right now, what did you do when you got to Nashville?

A Well they went over there I believe to talk to another boy. And the reason I was along was because Son had requested that I come. He wanted to see me and when I got there Sheriff Gaskins and Son came out

of the courthouse as we drove up there and we just leaned up beside the car there and chatted for a few minutes. And Son— when he started talking to me, Sheriff Gaskins told us that if we wanted to talk in private there was a little room there on the front of the courthouse that we could go in and this is what we did.

Q So you and Son alone went into the little interview room there?

A Right.

Q All right, what did you do when you got inside?

A Well, Son was wanting to tell me about what had happened and of course I told him I said now wait a minute Son I said you know I'm a Sheriff. He said sure I know you're a sheriff—I know you're the law Mr. Alderman. And I said let me advise you of your rights before you tell me anything. And I went into advising him of his rights and I advised him of the fact you know that he could have a lawyer and have him present while he was talking to me, that if he didn't want to talk to me he didn't have to—in fact, I was over there at his request. And went on to tell him about if he did decide to tell me anything and wanted to stop he could do that. I also told him he could remain silent. And I just tried to advise him generally of his rights. He said Mr. Alderman you know I don't need no lawyer to talk to you. Said you know I've known you a long time. I said Son, if you want to tell me something you go ahead.

Q What did he tell you?

A Well, he went on to tell me about what happened to the policeman. He seemed to be very upset about it to me. Son told me about the police officer stopping them there in Lakeland—Ray City there nearby somewhere and said that the police officer checked the car—the off side of the driver and walked off. But, he said he walked off and said he come back and said there's one more place I want to look and he went around to the driver's side and he pulled a bag of money out from under the driver's side and Son said then that he got some of them out of the car and put some of them back in his car, stretched them there and

searched them I believe and was coming back to the car to get some more of them— he thought that was what he was doing to put them in the police car and said they jumped him. And they overpowered the policeman. I don't really know whether they used—then they got in the car—I don't know whether it was the car they was driving or the police car. And said that they started riding around and said that these two boys were wanting to kill the police officer and he was begging them not to kill him. And they said well, we've got to kill him. He can identify us. And of course, I believe then the policeman told them this was his last day on the job and that he had a wife and family and he was trying to talk them out of killing him. But anyway he said they road (sic) around and come to some little old pond of water or something and said that these two young boys shot the police officer in the face several times with ratshot. And then he said all the time he's begging them not to kill the man. And said then one of them shot him with a pistol you know and I believe—

Q Let me stop you there. He said that they shot him with ratshot—

A A .22 rifle with ratshot in the face and blinded him.

Q And then they shot him with—

A After they did that they shot him with a pistol I believe, possibly with the man's own gun.

Q You're talking about the other pistol.

A Right. Now I might clarify this by saying that Son had told me that he had told Sheriff Gaskins and Greeson all of this and of course, you know this was over— not in my county and I just came over there because Sheriff Gaskin asked me to. I didn't write any of this down but I couldn't help but remember you know what he said about the police officer about it was his last day and the man was trying to get them not to kill him and—something that you don't forget.

Q Did he talk about any of the events that occurred prior to the police officer stopping them?

A No, sir.

Q He didn't tell you anything about the money in the bag—Did you ask him about that?

A No, sir.

Q So you just avoided that subject.

A Right.

Q Did he tell you anything else after the shooting of the police officer? Did he tell you what happened in the sequence of events after the officer was shot?

A I'm trying to remember. I don't believe he did.

Q Do you know why in the world he would have you come all the way over from Moultrie on a case that's not yours when he fully told you that he had just given the same information to the investigating officers?

A Well, I don't really know except for the fact that he had known me for several years and I had known him and he said I'd always been fair with him and of course, I told him, I said Son that's a terrible thing to be mixed up in. I'm sorry to see you get involved in something like this because it's an awful thing. I believe maybe Son broke down a little bit there. That's about—I didn't really question him.

Q Is there anything else you can recall about the interview that you haven't mentioned? I'm just searching your memory.

A I believe that about covers it.

. . . .

CROSS EXAMINATION BY MR. PARRISH:

Q Sheriff, you were advised that he—you went at his request.

A Yes, sir.

Q And, he told you voluntarily all that happened as he recalled?

A Absolutely.

Q And you started your statement by saying that he seemed very upset about what had happened to the chief.

A Well, yes, sir, this is the way he talked to me—said these young boys just looked like they were determined to kill him.

Q And, you said as he told you about what happened to the chief he broke down and cried.

A He shed some tears.

(Vol. II: 258–65).

. . . .

MR. HAROLD GREESON, called as witness in behalf of the State, after first being duly sworn, testified as follows:

DIRECT EXAMINATION BY MR. NEUGENT:

Q State your name, please.

A Harold Greeson.

Q Mr. Greeson, I'll ask you what is your employment.

A I'm an agent with the GBI [Georgia Bureau of Investigation].

. . . .

Q Did you later make an independent interview with Son Fleming?

A Yes, sir I did.

Q Where was he when you made that interview?

A Cook County Jail.

Q And what was the date that you made this interview?

A February 15.

. . . .

Q All right, going back to the 15th, where did you meet Son Fleming on that date?

A The 15th he was taken to a room by the deputy sheriff in the south end of the building here.

Q What deputy sheriff was that?

A Billy Snead.

Q Mr. Greeson, I'll ask you did you have a conversation with the Defendant Son Fleming.

A Yes, sir I did.

. . . .

Q And, did he make a statement to you?

A Yes, sir he did.

Q Will you tell the jury the substance of that statement.

A Son Fleming said that on February 11, that he borrowed a car from a boy named

Terry Coney over at Moultrie and that they left Moultrie around 8 o'clock the night of February 11 and drove down to Valdosta, Georgia. He said that when he arrived in Valdosta, the other two individuals that were with him, Larry Fleming and Henry Willis left in the car to go get a beer. Left him on the street down in Valdosta. He said next time he saw them was about 10:30 that night. They came back and picked him up and they were wet. And he asked them how they got wet. And he said they told him that the car had run hot and that they were putting water in the car and fell in the branch. And, they went around to a fellow named King West's house and changed clothes and they left Valdosta coming back to Moultrie and they got over somewhere around Morven and a police car over there pulled them over and stopped them.

Q Now, did he deny to you that he had any involvement in this killing?

A Yes, sir he did.

(Vol. II: 310–13).

. . . .

SHERIFF WALTER GASKINS, called as a witness in behalf of the State, after first being duly sworn, testified as follows:

DIRECT EXAMINATION BY MR. NEUGENT:

Q What is your name please, sir?

A My name is Walter Gaskins.

Q Are you Sheriff of Berrien County?

A Yes, sir.

. . . .

Q Now, Sheriff, did—what did Son tell you and Mr. Register with reference to his participation the first time you interviewed him [on February 12th]?

A He told us that he was in Valdosta at his uncle's house—King West.

Q And, did he subsequently tell you a different story?

A Yes, sir.

Q When did he tell you a different story?

A After King West was brought there and faced him.

Q Do you recall whether or not that was the 16th of February?

A That was the 16th. I believe it was the 16th.

Q And, was Son Fleming and King West placed together in a room?

A Yes, sir.

Q Were you present?

A Yes, sir.

Q And what was said?

A Son stated in the second interview that he was not at King's house.

Q Where did he say he was?

A He admitted that he was driving the car.

Q And, driving which car?

Q That was the car that he had borrowed from Terry—a boy by the name of Terry in Fitzgerald.

Q And, did he tell you what happened in Ray City?

A Yes, sir.

Q What did he tell you happened in Ray City?

A He said that in Ray City—that they were stopped by the police and he asked for his driver's license. He walked back to the front of the car, showed him the license and in the meantime, Mr. Giddens asked him if he could look in the car and he told him he could and he said that Mr. Giddens looked in the car and came out with the money from under the seat and caught—I believe he said this Larry by the arm to put him in the car. He said then, Larry and Henry jumped him.

Q All right, what did he say he did then?

A He said that they put Mr. Giddens in the car in the front seat. That Larry Fleming sat in the back seat, Henry Willis on the passenger side in the front seat, him driving and Ed between them.

Q Did he say where he took Ed Giddens?

A He said they turned off a road to the right and they went down to a pond.

Q Is that a country area?

A Yes, sir.

Q And, what did he say he did there?

A He said that they got out of the car—

Q Who was driving the car all this time?

A He said he was driving the car.

Q And, then what did he say happened?

A He said they got out and that Mr. Giddens started to run. And he had begged them not to—to leave him go that that was his last night on. He got out and started to run through the pond and said he heard several shots. And he said he—Mr. Giddens hollered and said he was hit. And he said then that he heard two or three more —sounded like .22 shots after he was in the water.

Q Now, who did he say drove off from there?

A He said he did.

Q Who did he say he took with him?

A Well, on the second occasion he admitted Larry and the other boy—he never gave his name.

Q Sheriff, did Son Fleming, in fact, have a driver's license?

A Yes, sir.

(Vol. II: 318, 322–24).

FAY, Circuit Judge, concurring specially:

Most respectfully, I concur in the judgment of the court but not in the reasoning of the majority opinion.

Although I agree that *Michigan v. Jackson* is an intervening change in the law, I do not believe that it is retroactive as to cases that are "final" and being reviewed by way of collateral attack. *Solem v. Stumes* and *Shea v. Louisiana* dictate such a conclusion and are reinforced by *Griffith v. Kentucky*.

In addition, I do not think the sentencing phase of a capital case falls within the phrase "truth-seeking" as used in opinions of the Supreme Court. Nor do I agree with the analysis used by the majority in that regard.

* Honorable John R. Brown, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designa-

I do join in the discussion and holding regarding harmless error (section IIA 3) and no assistance of counsel (section IIB).